**Howard A. FROMSON, Plaintiff,**

v.

**CITIPLATE, INC., Defendant.**

**No. 82 C 0986.**

United States District Court,
E.D. New York.

Nov. 10, 1988.

Felfe & Lynch (John E. Lynch, Alfred H. Hemingway, of counsel), New York City, for plaintiff.

Stoll, Wilkie, Previto & Hoffman (Robert S. Stoll, Doris S. Hoffman, of counsel), New York City, for defendant.

## OPINION AND ORDER

NICKERSON, District Judge.

In this patent suit the court decided on cross-motions for summary judgment that (1) defendant Citiplate, Inc. (Citiplate) had not sustained its burden of showing Claim 4 of plaintiff Fromson's patent invalid, (2) Citiplate had infringed Claims 1, 4, 6, 7, 12 and 16, (3) Fromson had not perpetrated a fraud on the United States Patent and Trademark Office (the Patent Office) in the original application proceedings or in the re-examination proceedings, and (4) summary judgment on the other claims and issues was inappropriate. 671 F.Supp. 195 (1987). Familiarity with that opinion is assumed. The court thereafter tried the case, finds the facts stipulated to by the parties and makes the following further findings of facts and conclusions of law.

The Court of Appeals for the Federal Circuit has considered the Fromson patent four times. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565 (1983); *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549 (1985); *Fromson v. Advance Offset*

*Plate, Inc.*, 837 F.2d 1097 (1987); and *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568 (1988). Those opinions and this court's previous opinion describe the art of lithography, Fromson's invention, the prior art, and the proceedings in the Patent Office. That discussion will not be repeated here.

The issues for decision are (1) whether Citiplate has shown invalidity of the patent claims at issue other than Claim 4, (2) whether Citiplate has shown that Fromson was guilty of laches in enforcing the patent or is estopped from enforcing it, (3) whether Citiplate's infringement was willful, (4) what are Fromson's damages, and (5) what sanctions, if any, should be imposed on Citiplate's attorney, Robert S. Stoll.

## I.  ALLEGED INVALIDITY OF THE PATENT

Chief Judge Markey's opinions in the *Advance Offset* and *Western Litho Plate and Supply Co.* cases cited above hold that other defendants failed to carry the burden of showing invalidity of the patent. However, Citiplate contends that alleged prior art not heretofore submitted to the Patent Office or to the courts anticipated the invention.

On the motions for summary judgment this court rejected this contention insofar as it related to Claim 4. Nothing in Citiplate's evidence as to the alleged invalidity of the other claims or in Citiplate's offers of proof as to the alleged invalidity of Claim 4 justifies reopening the issue as to that claim. While finding that the other claims were invalid would not affect the case's outcome, the court completes the record by addressing Citiplate's proof as to those other claims.

Each claim of the patent is presumed valid, 35 U.S.C. § 282, and the burden is on Citiplate to show invalidity. *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367 (Fed.Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). Citiplate argues chiefly that the Sumner Williams plate anticipated Fromson's invention. In rejecting this argument as to Claim 4 this court pointed out that

Williams did not commercially manufacture anodized plates and testified that he did not "use" them except "probably in testing."

The other patent claims do not mention anodizing, and Citiplate urges that the Williams plate falls within those claims. Claim 6, for example, states, in pertinent part, "an aluminum sheet having a surface which has been treated to form an aluminum oxide coating on said surface" to which an alkali metal silicate is applied. Williams testified he blasted aluminum plates with an aluminum oxide abrasive and then silicated them. Citiplate contends that by blasting Williams "treated" the plates to "form" an aluminum oxide "coating."

Even assuming that Williams' blasting was a "treatment" that "formed" an aluminum oxide "coating" within the meaning of Claim 6, this court finds that sale of the Williams plates did not anticipate the patent because they did not disclose the process by which they were made. Indeed, Williams testified that he never published what his process "was all about," but "more or less" maintained it as a "trade secret." Citiplate submitted no evidence of publications setting forth the Williams process.

A 1960 article by Citiplate's expert at trial, Albert R. Materazzi, describes the Williams plate as one of the principal makes of "wipe-on" aluminum plates "to which some sort of a grain structure has been imparted," by "dry steel brushes," by "wet-brushing with pumice powder," or by "sandblasting." The Graphic Arts Monthly, November 1960, p. 96, 100. Materazzi notes that after the plates have been grained "they must be specially treated to passivate the aluminum, so that it will not oxide." *Id.* This perception is quite contrary to Citiplate's contention that the Williams plate was "treated" to "form an aluminum oxide coating."

Moreover, the court finds that the premise for Citiplate's argument is incorrect and accepts the testimony of Fromson's experts G.H. Kissin and Robert F. Leonard, Jr., that the surface of the Williams plate be-

fore silicating had nothing more than a thin natural oxide film. Such an oxide film is not the "aluminum oxide coating" referred to in the claims of the patent. The Patent Examiner specifically rejected a contention that plates with merely a natural oxide film anticipated Fromson's invention. Such plates do not have the extremely hard surface of plates made in accordance with the patent and are therefore less desirable.

As this court noted previously, the patent specifications recite at one point that the aluminum oxide "coating" was "produced, for example, by anodizing the aluminum sheet." But the only method described throughout the specifications for obtaining that "coating" was by anodizing. Citiplate presented no evidence that anyone ever made a similar "coating" except by anodizing.

Citiplate asserts that reports called the Gramlich papers are prior art that invalidates the patent. These were allegedly presented at the Lithographic Technical Foundation research committee 1958 and 1959 meetings attended by over a hundred people. Each report discusses anodizing and then silicating zinc plates. Each has a cover sheet reading "Reports of Progress" during the year in question and "None of the Information in this Folder is for Publication." Written in ink on the face of each report is "Not to be removed from library." The papers never appeared in the Foundation's publication *Research Progress*, and the Foundation under its policy thus deemed that they did not "warrant" publication.

Fromson says these papers do not even qualify as prior art because there is no evidence that they were ever publicly available. The court need not address this argument because the papers do not anticipate or suggest the invention.

The reports discuss the anodizing not of aluminum plates but of zinc plates and show that anodized zinc plates have undesirable lithographic properties, as Citiplate's expert Materazzi admitted. He testified that he knew of no commercially successful plates made from anodized zinc. Rather than show that Fromson's invention

was obvious, the papers suggest the opposite. If a person skilled in the art realized that anodized and silicated zinc plates were not satisfactory, that person might infer that an anodized and silicated aluminum plate would be unsatisfactory.

Citiplate urges that an article by Gyan P. Madan appearing in the April 1961 issue of *Printing Production* anticipates the patented invention. There is not the faintest merit to this. As Materazzi admitted, there is no statement in the article that teaches making a plate by anodizing aluminum and then treating it with silicate. The article merely suggests what had long been known, namely, that silicating aluminum and anodizing aluminum were alternative pretreatments to stabilize an otherwise reactive aluminum surface.

In its prior opinion this court held that the work of Gordon H. Silver, a consultant to Sumner Williams's company, did not represent prior art invalidating the patent. Citiplate now seeks to reargue the issue, saying that the "public" has an interest in seeing the patent invalidated. Since the patent has long since expired, there is now no immediate advantage to the public in invalidating the patent.

In any event, this court adheres to its decision that the 1960 notes of Silver, referring to a "Proposed Experimental Approach" to treatment of aluminum plates by anodizing, do not constitute invalidating prior art. This court focussed again on the issue when Citiplate applied for reargument. There is no documentary proof that Silver ever made an anodized and silicated aluminum plate. If his experiment was in fact carried out, he must have regarded the result as unsuccessful or did not appreciate what he had done. To invalidate the patent on such flimsy evidence as that presented by Silver would be to treat the inventor "as the lawful prey of the infringer." *Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed–Wire Co.*, 143 U.S. 275, 285, 12 S.Ct. 443, 447, 36 L.Ed. 154 (1892).

■ Citiplate has not sustained its burden of showing that Claims 1, 4, 6, 7, 12 and 16 are invalid.

## II. THE ALLEGED LACHES AND ESTOPPEL DEFENSES

Citiplate contends that the court should bar Fromson from enforcing the patent because (1) he committed laches by delaying more than six years in filing suit after allegedly obtaining knowledge of Citiplate's infringment and (2) Citiplate was thereby materially prejudiced.

Fromson filed this action on April 6, 1982. Citiplate argues that it was anodizing and silicating in 1975 and that Fromson should have known it because the plates exhibited by Citiplate at shows were advertised as anodized and Fromson could have tested them for silicon. Further Citiplate says that Fromson's knowledge is shown as of February 26, 1976 when he obtained a Dun & Bradstreet financial report on Citiplate.

While Fromson had reason to believe that Citiplate might be infringing by February 1976, he did not actually know nor should he have known of the actual infringement until long after the date of April 6, 1976, six years before the filing of the complaint.

On September 3, 1976 Fromson, through his attorney, wrote to Citiplate stating that Fromson had reason to believe that the patent "may be pertinent to your operations and we would appreciate having your comments." Enclosed with the letter was Fromson's complaint alleging infringement against Polychrome Corporation, filed in the United States District Court for the Southern District of New York on April 29, 1976. Citiplate made no answer.

On October 27, 1976 Fromson's attorney wrote a reminder asking for Citiplate's comments. On November 22, 1976 the law firm acting as Citiplate's general counsel (not patent counsel) wrote back saying they were "unable to determine from your correspondence and attached exhibits whether in fact an infringement has occurred nor what is meant by your statement that 'we have reason to believe that Mr. Fromson's patents may be pertinent to your operations.'" On November 23, 1976 Fromson's attorney called Citiplate's counsel, explained that Fromson believed Citiplate was selling anodized and silicated plates infringing the patent, suggested that Citiplate get patent counsel, and said that Fromson was making licenses available to the industry.

On November 30, 1976 Fromson's attorney wrote a "follow up" to the telephone conversation. Again Citiplate made no reply, and on April 28, 1977 Fromson's attorney wrote to Citiplate's general counsel asking that Citiplate give attention to the matter and concluding "[t]he question that needs answering is whether or not your client is making or using any of the products covered by Mr. Fromson's patents." On May 2, 1977 Citiplate's general counsel responded that "we did not feel any answer was required" and that "[w]e are satisfied that our client is conducting his business in a wholly proper fashion." Citiplate's general counsel had not sought advice of patent counsel.

Fromson's attorney wrote further letters to Citiplate's general counsel on July 11, 1977 and August 25, 1977 asking whether Citiplate was making or using any products covered by the patent. There was no written reply. Finally, on September 8, 1977 Citiplate's general counsel called and talked to Fromson's attorney, who forwarded a copy of the patent. When Citiplate's general counsel made no answer, Fromson's attorney on October 4, 1977 and October 21, 1977 asked for a response. There was none. On April 19, 1979 Fromson's attorney sent to Citiplate a copy of the application to the Patent Office seeking reissue of the patent and invited Citiplate to participate. Citiplate did not reply and did not participate.

About two and a half years later, on October 14, 1981, Fromson's attorney wrote to Citiplate's general counsel stating that Fromson intended to enforce his patent rights against all infringers as soon as the reissue proceeding was concluded. Only then did Citiplate's general counsel respond on October 26, 1981 that he was discussing the matter with his client "and will then be in a position to respond to your allegation concerning our client's suspected misconduct." On November 23, 1981 Citip-

late's general counsel asked for a copy of a proposed licensing agreement. On February 3, 1982 Fromson's attorney wrote to say that the reissue proceeding had been fully favorable to Fromson, that the *Advance Offset* case was expected to go to trial soon, and that Fromson would defer a decision on licensing until the case was ended.

■ These facts speak for themselves. Over a considerable period of time Fromson tried to find out whether Citiplate was in fact making or selling products covered by the patent. Citiplate resolutely refused to address that question, and, without even consulting patent counsel, its general counsel wrote on May 2, 1977 that he was satisfied that Citiplate was conducting business "in a wholly proper fashion." Citiplate's general counsel thus either deliberately sought to mislead or acted recklessly.

In any event the facts of record show that Fromson is not chargeable with knowledge of Citiplate's infringement within six years before he filed suit.

Moreover, Citiplate's "dog in the manger" attitude cannot hide the fact that it was well aware from September 3, 1976 on that Fromson intended to enforce his rights. It knew by that date that he was suing another company. By October 27, 1976 it knew that the alleged infringer had taken a license. By November 30, 1976 Citiplate knew that three other companies were licensed. It later knew of the *Advance Offset* litigation and the reissue pending.

It is a bold, not to say reckless, litigant who can claim in the light of the record in this case that it supposed Fromson intended to abandon his rights. Fromson, not Citiplate, was prejudiced by his delay in filing suit. He lost royalties for the sales made by Citiplate before April 6, 1976. Citiplate gained those sums and thereafter built up its business based on its infringement.

Fromson is not chargeable with any of the occurrences that Citiplate claims prejudiced its defense. Citiplate knew at an early date of Fromson's determination to enforce his rights. The court finds no merit in the laches defense.

■ What has been said also disposes of the defense of estoppel. The claim that Citiplate relied to its detriment on Fromson's "failure to charge infringement" is ludicrous in the light of the documentary evidence. The court finds that Citiplate relied on its own concealment of its infringement.

## III. WILLFUL INFRINGEMENT

■ Commencing in September 1974, Citiplate infringed the patent. Indeed, on the motion for summary judgment Citiplate raised no substantial issue of material fact as to infringement.

Fromson proved beyond doubt that Citiplate infringed willfully. The foregoing discussion as to laches and estoppel details the notice Citiplate received as to the patent. When he read the patent Charles Cusumano, the founder of Citiplate, understood it described anodized and silicated aluminum. Yet Citiplate never obtained the opinion of patent counsel.

Citiplate argues that the letters from Fromson's counsel to Citiplate and its general counsel did not actually "charge" it with infringement and that therefore the claim of willful infringement is "untenable." Those letters were designed to elicit whether Citiplate was infringing. Quite palpably it concealed the fact that it was.

There is no credible support for Citiplate's contention that it independently invented the anodized and silicated plates it made and sold. When Citiplate started anodizing the demand for Fromson's plate was increasing dramatically. Citiplate's testimony that it adopted anodizing as a logical extension of the technology used in making the Sumner Williams plate is wholly incredible.

Citiplate had no reasonable basis for believing it had a right to make and sell the infringing plates. Even aside from its decision not to consult patent counsel, Citiplate acted in bad faith, concealing the fact of its infringement. All the circumstances show that Citiplate infringed willfully.

## IV. DAMAGES

Having found for Fromson the court will award him damages "adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention" by Citiplate. 35 U.S.C. § 284.

### (a) *Reasonable Royalty*

In order to determine a reasonable royalty the court must decide what royalty a willing licensor and a willing licensee would have agreed upon in an arm's length negotiation when infringement began in September 1974. *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 898 (Fed.Cir.1986), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078–79 (Fed.Cir.1983)).

As C.G. Knorr, Jr., Fromson's witness, testified, there were in 1974, and still are, two major segments of the market for lithographic plates. One is for "commercial" printing of books, labels, and the like. The other is largely for newspaper printing. Citiplate's witness Cusumano referred to this second segment as the "low end" or "wipe-on" market. After Citiplate started anodizing in 1974 it began selling anodized plates to some of the big metropolitan newspapers, and its sales to other newspapers increased.

After filing his patent application Fromson sought to commercialize his invention by contacting manufacturers of printing plates. Starting in 1968 the first customers were S.D. Warren, 3M Company, and Rogers Corporation. These companies bought anodized and silicated coil from Fromson's company Ano–Coil Corporation (Ano–Coil) and converted it into printing plates. They sold these mostly to the commercial market, under an implied license from Fromson. Customers such as S.D. Warren and 3M sold to that commercial market at from five to six times the amount paid Ano–Coil for anodized and silicated coil.

For the fiscal year ended April 30, 1974 Ano–Coil made a profit of 7.7% on the sales to manufacturers of plates, and for the 1975 fiscal year 11%. Fromson testified that he had always wished to exploit the patent by selling coil to plate manufacturers, and that Ano–Coil, in the early 1970s having installed a second line for making anodized and silicated coil, had the capacity to supply all plate manufacturers.

Fromson also testified that had he been forced to license Citiplate rather than sell coil to it he would have asked for a royalty that would have yielded the same dollar profit as he had made had he sold the coil at a profit of 11%. Thus, he says he would have demanded a royalty of 5.5% on the sale by Citiplate of wipe-on plates and 3.66% on presensitized plates.

Fromson, who knew the business well, calculated these percentages by estimating the dollars Citiplate would have realized had it hypothetically bought coil from Fromson, used it to make wipe-on or presensitized plates, and sold these plates in the market. Fromson estimated that on a hypothetical purchase of $100,000 worth of coil (on the sale of which Ano–Coil would have made 11% or $11,000) Citiplate could have made wipe-on plates and sold them for about $200,000. Of that figure $11,000 is 5.5%. Or Citiplate could have used the same amount of coil to make pre-sensitized plates and sold them for $300,000. Of that figure $11,000 would be 3.66%.

Citiplate submitted no evidence to refute these estimates of what it would have realized on selling plates.

Fromson's invention greatly improved aluminum lithoplates. It provided an extremely hard surface, highly resistant to abrasion, scratching, and corrosion and possessed of the properties of water receptivity and ink repellancy. This hardness gave plates made pursuant to the Fromson invention a highly significant advantage over plates made according to the prior art. Harder plates run longer on the printing press.

In addition, the anodized plate had better water carrying characteristics and ran better on the printing press; basically, as plaintiff's witness C.G. Knorr, Jr., testified, "a faster roll up" and "a superior product." Cusomano testified that Citiplate decided in

1982 to go completely to anodizing "because it improved the product." In its advertisements Citiplate emphasized that its "new anodized lithographic plate" because it was so "hard-surfaced" delivered "as good a last impression as the first."

Knorr's testimony, which was credible, details the commercial success of the Fromson plates. The infringer Western Litho Plate and Supply Co. (Western) was in 1972 a dominant factor in the lithographic plate market, its prime products being anodized and silicated aluminum plates. Around 1973 the St. Louis Post Dispatch converted to such plates furnished by Western. This gave great impetus to a conversion to lithography and to the use of anodized and silicated aluminum plates by newspapers. Western was able, because of lack of competition, to sell these plates at premium prices.

Then another infringer Advance Offset Plate, Inc., (Advance) entered the market in direct competition with Western, offering the same anodized and silicated plate products but at lower prices. By such tactics Advance soon became a major factor in the litho plate market. Then still other infringers came into the market with the same anodized and silicated products. These included not only Citiplate but Hydrographics, Graphcom, Imperial, RBP and Phoenix Litho. For quite obvious reasons the prices dropped below those that a supplier with a license to the patent could have charged.

Meanwhile and prior to 1974 a number of companies producing a non-anodized product were no longer in business, these included Chicago Litho, London Litho, Boyce Product, Litho Aluminum, Premier Graining, and Durolith. Sumner Williams, Inc. when acquired by Citiplate was bankrupt. As Knorr testified, by 1974 the market conditions showed that a company had to have an anodized and silicated product "in order to compete and grow, and to support the market growth which was obvious in this paper market."

It is clear that in 1974 a plate maker needed the anodized and silicated product to survive in the future. Without it a plate maker would have lost its market not only for plates but for associated products such as chemicals, including wipe-on coating, developer, finisher, cleaner, and scratch desensitizer.

Citiplate's witness on damages was not useful to the court in determining an appropriate royalty. That witness, Martin A. Levitin, a patent attorney, gave his opinion that Fromson was entitled to no more than he received on the licenses he entered into with infringers. Levitin admitted on cross-examination that he did not address himself to how the court should go about reconstructing a hypothetical negotiation to determine a reasonable royalty before infringement.

Levitin agreed that in evaluating a reasonable royalty before infringement one should consider how innovative the product might be, the scope of the patent, the cost benefits, the potential market, competition, whether or not the patent holder was himself using the technology, and what the potential profitability was to the licensee. Counsel for Citiplate never asked him to go through that exercise.

Fromson's damages plainly should not be measured by the amount he realized on licenses to infringers. Judge Robert E. Keeton, United States District Court for the District of Massachusetts, decided on December 11, 1986, in the *Advance Offset* case that he would not receive in evidence such licenses to the infringers for the purpose of showing an appropriate royalty to Fromson. He excluded them under Rule 408 of the Federal Rules of Evidence as evidence of a compromise where the validity of the patent was in issue. He also excluded them under Rule 403 of the Federal Rules of Evidence because their probative weight was extremely limited in the light of the prior infringement by the licensees and others and the dispute as to the validity of the patent. For the same reasons this court does not regard those licenses as an appropriate measure of a reasonable royalty.

Citiplate's brief argues that acceptable non-infringing substitutes for the anodized and silicated plates existed in 1974, and

that Citiplate's wipe-on plates, both anodized and non-anodized, did not compete with the more expensive presensitized plates of 3M Company and S.D. Warren. The court does not accept the contention that there were adequate substitutes for the anodized plates or the implication that Fromson is not entitled to a royalty on sales of wipe-on plates.

For reasons already stated the anodized plates were far superior to the non-anodized plates. Although some companies in the market would accept a cheaper non-anodized product for short runs, the great potential in the market lay with customers, including newspapers, which had long runs.

In the first year for which Citiplate submitted actual sales figures, 1978, Citiplate sold about two and a half times more anodized plates than non-anodized. Within two years Citiplate's sales of non-anodized plates dropped off to practically nothing. There is therefore nothing in the Citiplate sales figures that casts doubt on the testimony of Knorr as to the potential for anodized plates that a prospective licensee in 1974 would have appreciated.

Of course, Fromson is entitled to damages for the infringing sales of wipe-on anodized plates. The fact that they were less costly than pre-sensitized plates does not make them any less infringing.

Citiplate urges that its financial condition was such that it would not have agreed to the royalty for which Fromson contends. Citiplate points to its financial reports for the fiscal years 1976 through 1980. Citiplate cannot, of course, show what its profits would have been in the absence of other infringers.

Moreover, the financial reports show the extremely substantial growth of Citiplate over the years disclosed. However, they do not break down the profit figures to show the amount realized on sales of anodized and non-anodized plates and are therefore not very useful.

In any event, a reasonable royalty is not based on the infringer's profit even on the infringing product. *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1557 (Fed.Cir.1986). The royalty may exceed the infringer's profit. *Fromson v. Western Litho Plate and Supply Co., supra.*

The court is satisfied that unless a plate maker such as Citiplate had had a license from Fromson it would have had a bleak future at best and at worst would have been forced out of business. In the absence of infringers Fromson would have been under no compulsion to license anyone. He could have remained in his basic business of making coil and selling it to plate manufacturers. Citiplate had no alternative. Unless it infringed it had to take a license or face disaster.

The first infringement took place five months into Ano–Coil's 1975 fiscal year, which began May 1, 1974. By that time the potential for the patent was becoming increasingly obvious. It is therefore reasonable to base Ano–Coil's profits on the fiscal year 1975. They were about 11% of sales for that fiscal year.

However, the court does not believe that it is appropriate to determine the royalty by basing it on Fromson's 11% profit on sales of coil. A part of that profit should be considered as a return on the invested capital of the company and not as profit due to the patent. The record does not contain figures from which the court can determine such a return.

The court can, however, obtain some approximation of what amount of return is fairly attributable to Ano–Coil's invested capital, and hence what portion of the profits were due to the patent. Ano–Coil had an operating profit for fiscal 1975 of about 34% of total assets. The court has, in the absence of any figures in the record, taken judicial notice of the three month Treasury Bill yields for the calendar year 1974, an average figure of 7.15%.

The 1975 Treasury Bill yield was 5.44%, but presumably the negotiation of the reasonable royalty would have been completed by the end of calendar 1974. The calendar 1974 Treasury Bill figure and the fiscal 1975 Ano–Coil financial figures both represent returns from the relevant time period,

the latter portion of 1974 when the first infringement took place.

■ To approximate the share of Ano–Coil's profits reasonably attributable to the invested capital of Ano–Coil (and not to the patent), the court uses the following formula:

$$\frac{\text{reasonable return on invested capital (as represented by 3-mo. Treasury Bill yields)}}{\text{Ano–Coil's return on total assets}} = \frac{\text{x}}{\text{(\% profit attributable to invested capital)}} \Big/ \frac{}{\text{Ano–Coil's profit on sales}}$$

Substituting the appropriate numbers into the formula:

$$\frac{7.15}{34} = \frac{\text{x}}{11}, \text{ x equals 2.3.}$$

The court thus attributes the percentage of profit due to the invested capital as 2.3%. The balance of the 11% or 8.7% is fairly allocable to the patent. On the basis of a sale of wipe-on plates at twice the cost of the coil hypothetically bought from Ano–Coil the royalty on the sale of such plates would be 4.35%. On the sale of pre-sensitized plates the royalty would be 2.9%. The court finds these royalties reasonable.

#### (b) *Add-on due to infringement*

The court under 35 U.S.C. § 284 may award damages in excess of the "reasonable royalty" if such an award is required to make damages "adequate to compensate for the infringement."

The determination of a reasonable royalty negotiated between Fromson and Citiplate after infringement is not the same as a royalty that would have been reached between two really "willing parties." Thus, the critical question is not what Citiplate and Fromson would have agreed upon. If that were the criterion it would "make an election to infringe a handy means for competitors to impose a 'compulsory license' policy upon every patent owner." *TWM Mfg. Co., Inc. v. Dura Corp., supra,* at 900 (quoting from *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1158 (6th Cir.1978)).

To make a truly "adequate" award, this court may increase the damages over the reasonable royalty, and such an increase "may be stated by the trial court either as a reasonable royalty *for an infringer* (as in *Panduit* [*supra* ]) or as an increase in the reasonable royalty determined by the court." *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1563 (Fed.Cir.1983) (emphasis in original).

The court is persuaded that the "reasonable royalty" of 4.35 percent and 2.9 percent does not adequately compensate Fromson. He had to put his patent at risk. He had to engage in painful and time consuming litigation. Because of the degree to which infringers competed in the market, the real extent of his damages cannot be precisely measured.

Fromson claims with some justification that his company, Ano–Coil, would be many times larger had there been no infringement. His objective was to supply anodized and silicated aluminum coil to plate suppliers who wished to market his plate. There was no substantial other use for such coil. Without the presence of infringers he could have continued solely as a supplier of coil, his chief business, and made economies of scale as his production increased. When the infringers installed their own aluminum treatment facilities and competed among themselves, Fromson lost not only the premium that his product would have enjoyed but also the potential for expansion. He was forced to go into the manufacture of plates in fierce competition with infringers.

■ For these reasons the court in its discretion increases the reasonable royalty for wipe-on plates by 10 percent and the reasonable royalty for pre-sensitized plates by 7.5 percent. The royalty thus should be 4.78% for wipe-on plates and 3.1% for pre-sensitized plates.

#### (c) *Prejudgment interest*

■ Prejudgment interest should ordinarily be awarded. *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655–56, 103 S.Ct. 2058, 2062–63, 76 L.Ed.2d 211 (1983). There is no reason why it should not be awarded in this case on the primary damage claim from the time of infringement to the date of payment. The interest will be determined at the 52–week United States Treasury Bill rate compounded annually.

#### (d) *Increased damages*

■ Under 35 U.S.C. § 284 "the court may increase the damages up to three times the amount found or assessed." The court has found above that Citiplate's infringement was willful. For the reasons discussed above as to an add-on due to infringement the court finds that damages should be increased to three times the amount found. *TWM Mfg. Co., Inc. v. Dura Corp., supra,* at 902; *Great Northern Corp. v. Davis Corp. & Pad Co.,* 782 F.2d 159, 166–67 (Fed.Cir.1986). These increased damages will not bear prejudgment interest. *Leinoff v. Louis Wilong & Sons, Inc.,* 726 F.2d 734, 743 (Fed.Cir.1984).

#### (e) *Attorney fees*

■ The courts may award "reasonable attorney fees" to plaintiff if the case was "exceptional." 35 U.S.C. § 285. The court finds the case exceptional because of Citiplate's willful infringement, *see S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.,* 781 F.2d 198, 201 (Fed.Cir.1986), and because of the conduct of Citiplate in the litigation, a matter dealt with hereafter.

Plaintiff has submitted copies of the bills rendered by its counsel for fees and expenses from the inception of the litigation in August 1982 through August 25, 1988, following the filing of post-trial briefs. The court has examined the submissions and finds that the billing rates, the time expended, and the expenses charged are reasonable. The court fixes attorneys fees at $357,994.72 and expenses at $57,914.54, for a total of $415,909.26.

### V. SANCTIONS ON CITIPLATE'S ATTORNEY

The court deems that the behavior of Citiplate's attorney Robert S. Stoll fell far below the standards expected of an attorney in this court.

Mr. Stoll adamantly refused to comply with the explicit directions of Magistrate John Caden. Mr. Stoll then represented to the court that he had so complied and that the magistrate was satisfied. The court therefore called Magistrate Caden into the conference with the attorneys and had a reporter record the proceedings. It became clear that Mr. Stoll had made a misrepresentation to the court. Moreover, it also developed that he had previously made misrepresentations in a letter to the magistrate, stating "I appreciate your indicating this past Friday that we have complied with your directives."

The following extracts from the record show the Magistrate's findings and the court's conclusion.

> MAGISTRATE CADEN: Perhaps the last straw, and I'll be quiet, is the correspondence that I received. I received a letter dated June 7th from defendant's counsel and I received also a letter dated June 7th from Mr. Lynch. The letter of June 7th from Mr. Stoll says that I appreciate your indicating this past Friday that we have complied with your directives and that you would provide an order to such effect for the record. Such a proposed order is included for your review and approval. I regret my application to submit test results was so upsetting.

> THE COURT: Is that accurate, what is said in that letter.

> MAGISTRATE CADEN: Wholly inaccurate.

> .     .     .     .     .

> When defendant's counsel writes to me that basically this is the—he complied with my directives, in my opinion in this particular case he had not complied with my directives. I don't believe he could have reasonably thought that he complied with my directives and basically again we were doing things his way. We were simply going to live with the way he decided to do expert discovery, the way he decided to answer expert interrogatories and the way he decided to identify documents. He was not going to do it my way.

> I told him early on that I made a finding his basic responses to the interrogatories and his basic responses to expert discovery was deficient.

I said I would stand by that comment for however long in this particular case I felt that was the case. I stood by it as far as I am concerned through this litigation and I stand by it today.

. . . . .

THE COURT: [Magistrate Caden's] direction was with respect to each witness, each witness, and that's in the transcript where you and I and Mr. Lynch sat as well as Ms. Hoffman. There can't be any doubt about that, Mr. Stoll. Please don't misrepresent again to me, the way you did before, before I got the magistrate up.

. . . . .

MAGISTRATE CADEN: What you neglected to tell Judge Nickerson there is a finding, which is that in terms of complying with expert discovery in this particular case, consistent with my orders and my conferences, it's wholly deficient. Not deficient—totally deficient, and I made it clear to you and I think we were using the Judge Pratt method.

In my opinion you have known that for many many months and I ask you again as I asked you at every conference, have you summarized specifically and in detail either in narrative form or in Q and A form, with exhibits referred to appropriately, the direct testimony of each and every one of these witnesses so that this district court judge can pick them up and have a fair idea of which this case is about, even in advance of their testimony?

Have you done that, sir?

MR. STOLL: Apparently I have not.

MAGISTRATE CADEN: You know you have not.

█ Fromson asserts that Mr. Stoll's bad faith was manifested in other ways, namely, by the assertion of meritless defenses, harassing conduct to increase litigation costs, other misrepresentations, and dilatory tactics. The court finds that Mr. Stoll did increase the costs of the litigation by obstructive and dilatory tactics both in the discovery stage and at trial. But his most egregious conduct was in misrepresenting to the court and the magistrate.

The court finds that the appropriate sanction is to set forth here the facts and to express the court's opinion as to the impropriety of Mr. Stoll's conduct.

## VI. CONCLUSION

The parties are directed to settle judgment on notice in accordance with the findings in this opinion. So ordered.