**LINKCO, INC., Plaintiff,**

v.

**FUJITSU LTD., Defendant.**

**No. 00 CIV. 7242(SAS).**

United States District Court, S.D. New York.

Nov. 14, 2002.

Irving B. Levinson, Joseph G. Finnerty, Jr., Michael R. Hepworth, Piper Rudnick LLP, New York City, for Plaintiff.

Richard J. O'Brien, Paul E. Veith, Sidley, Audtin, Brown & Wood, Chicago, IL, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

LinkCo, Inc. ("LinkCo") was formed in 1995 as an Internet content company with a mission to become the preeminent worldwide provider of comprehensive information about Japan's public companies delivered in an electronic format. *See* Complaint ("Compl.") at ¶ 11. The company was created in response to the Japanese Ministry of Finance's announcement that the government was adopting an electronic corporate disclosure reporting system. *See Linkco, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242, 2002 WL 237838, at *4 (S.D.N.Y. Feb.19, 2002) ("*Linkco I*"). Although LinkCo designed various computer systems for two years, it never commercialized a product. *See id.* at *1.

After LinkCo ceased operations in December 1997, one of its former directors, Kyoto Kanda, began working for Fujitsu Ltd. ("Fujitsu"), a large Japanese company that in addition to its many other products, became interested in developing programs related to corporate disclosure. *See id.* at *1–*2. On March 31, 1999, Fujitsu publicly announced the development of DisclosureVision—a software package that performs some of the same functions as the computer system designed by LinkCo. *See id.* As a result, on September 25, 2000, LinkCo sued Fujitsu on the ground "that certain elements of DisclosureVision are copies of its technology, 'virtually identical in design and substance.'" Id. (quoting Compl. ¶ 46). Indeed, LinkCo claimed that "'virtually every significant element of Fujitsu's DisclosureVision was stolen from LinkCo's technology.'" Id. (quoting Compl. ¶ 48). LinkCo brought this action, alleging that Fujitsu engaged in misappropriation of trade secrets, unfair competition, and tortious interference with contract.[1] *See id.*

Both parties proposed competing jury instructions concerning the appropriate

---

1. LinkCo also brought claims of misappropriation of trade secrets under Massachusetts law and conversion, but voluntarily dismissed these claims prior to trial. *See* Defendant's Trial Memorandum at 3 n. 3; 9/30/02 Trial Tr. at 6.

measure of damages for each claim.[2] During the trial, I made an oral ruling as to the appropriate measure of damages in a trade secret case.[3] I write now to fully set forth the reasoning supporting that decision.

The parties differ as to whether damages for the alleged misappropriation of a trade secret should be measured by (1) LinkCo's losses, (2) Fujitsu's unjust enrichment, or (3) a reasonable royalty.[4] *See* LinkCo's Memorandum of Law on the Appropriate Measure of Damages ("Pl. Mem.") at 3–7; Fujitsu's Memorandum of Law on the Appropriate Measure of Damages ("Def.Mem.") at 2–4. For the reasons below, I conclude that a reasonable royalty is the proper measure of damages.[5] Because the reasonable royalty measure applies, I also conclude that the parties may not introduce evidence of sales projections that were prepared after the alleged date of theft or evidence of Fujitsu's actual profits arising from its sales of Disclosure-Vision.

**2.** Prior to submitting proposed jury instructions, Fujitsu moved for summary judgment and submitted a motion in limine to exclude certain evidence. On February 19, 2002, Fujitsu's motion for summary judgment was denied. On July 16, 2002, Fujitsu's motion in limine to exclude the testimony of LinkCo's expert, Bruce Webster, was granted. *See Link-Co, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242, 2002 WL 1585551, at *5 (S.D.N.Y. July 16, 2002) ("*LinkCo II*"). Both parties moved to exclude the testimony of the adversary's damages experts and those motions were granted. Pursuant to the July 16 order, the parties were permitted to revise their expert reports. *See id.* at *5.

**3.** At the close of LinkCo's case, Fujitsu moved for a judgment as a matter of law ("JMOL"). The motion was granted in part. The misappropriation of trade secret claim and the tortious interference of contract

## II. APPROPRIATE MEASURE OF DAMAGES

### A. Plaintiff's Losses, Defendant's Unjust Enrichment, or a Reasonable Royalty

■ Once it is established that a trade secret has been misappropriated, there are two obvious ways to calculate plaintiff's damages. *See A.F.A Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir.1991) ("The amount of damages recoverable in an action for misappropriation of trade secrets may be measured either by the plaintiff's losses or by the profits unjustly received by the defendant.") (citations omitted). *First*, damages may be measured according to any losses plaintiff suffered from the alleged misappropriation. Plaintiff's losses may include the cost of developing the trade secret and the revenue plaintiff would have made but for the defendant's wrongful conduct. *Second*, damages may be measured by the defendant's unjust enrichment as a result of the misappropriation. Unjust enrichment is measured by the profits the defendant obtained from using the trade secret. *See Electro–Min-*

claim were dismissed because LinkCo failed to provide sufficient evidence to support these claims, leaving only the unfair competition claim. *See LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242, 2002 WL 31427365, at *12 (S.D.N.Y. Oct.29, 2002). Then, at the close of all the evidence, Fujitsu moved to dismiss the only remaining claim. However, the Court reserved judgment on this motion until after the jury's verdict. On November 6, 2002, the jury found Fujitsu liable for unfair competition and awarded LinkCo $3.5 million in damages.

**4.** The parties agree that New York law applies in this case. *See* LinkCo's Trial Memorandum of Law ("Pl. Trial Mem.") at 2 n. 1. *See also Linkco I*, 2002 WL 237838, at *2 n. 3.

**5.** This opinion only addresses the measure of damages for misappropriation of trade secrets.

*iatures Corp. v. Wendon Co.*, 771 F.2d 23, 27 (2d Cir.1985).

■ ·In certain circumstances, these damage calculations provide inadequate compensation to the plaintiff. Courts have therefore developed a third measure of damages: a reasonable royalty.[6] "A reasonable royalty award attempts to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff." *Vermont Microsystems I*, 88 F.3d at 151. To measure this value, "the Court calculates what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred." *Id.* (citing *Georgia–Pacific Corp. v. U.S. Plywood–Champion Papers, Inc.*, 446 F.2d 295, 296–97 (2d Cir.1971)). Because the plaintiff's loss or the defendant's gain may be very difficult to calculate in intellectual property cases, a reasonable royalty is "a common form of award in both trade secret and patent cases." *Vermont Microsystems, Inc. v. Autodesk, Inc.*, 138 F.3d 449, 450 (2d Cir. 1998) ("*Vermont Microsystems II*"); *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1128 (5th Cir.1991), *aff'd*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Moreover, a reasonable royalty is ideal when the commercial context in which the misappropriation occurred requires consideration of multiple factors in order to compensate the plaintiff ade-

quately. *See University Computing*, 504 F.2d at 538.

### B. Reasonable Royalty Applies to this Case

■ Neither LinkCo's losses nor Fujitsu's unjust enrichment can serve as an adequate method of calculating damages. *First*, LinkCo's losses are an inadequate measure of damages because the company ceased operations very close to the time of the alleged misappropriation, making losses difficult to establish. Measuring Link-Co's damages after it was already out of business would require a fact-finder to speculate as to the revenue LinkCo may have made if it had remained in business. In addition, losses measured solely by LinkCo's development costs would not adequately compensate the company for its loss of the potentially valuable trade secret. *Second*, Fujitsu's unjust enrichment is impossible to measure because the company did not make any profits from DisclosureVision. Nevertheless, "the lack of actual profits does not insulate the defendants from being obliged to pay for what they have wrongfully obtained." *University Computing*, 504 F.2d at 536 (citing *In re Cawood Patent*, 94 U.S. 695, 24 L.Ed. 238 (1876)). Under these circumstances, a reasonable royalty avoids the danger of an inadequate measure of damages by enabling the jury to consider various relevant factors to reach the most practical and sensible award.[7] Therefore, a reason-

---

6. *See Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d Cir.1996) ("*Vermont Microsystems I*") (upholding trial court's decision to award reasonable royalty due to insufficient evidence of lost profits and unjust enrichment); *University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 535–37 (5th Cir.1974)(concluding that a reasonable royalty is the appropriate measure of damages because plaintiff's losses cannot be computed); Restatement (Third) of Unfair Competition § 45 cmt. g (1995) ("[W]hen the plaintiff's loss, although difficult to measure,

is apparently greater than any gain acquired by the defendant, a reasonable royalty may be the most appropriate measure of relief.").

7. A jury should consider the following when determining a reasonable royalty: (1) the resulting and foreseeable changes in the parties' competitive posture; (2) the prices past purchasers or licensees may have paid; (3) the total value of the secret to the plaintiff, including plaintiff's development costs and the importance of the secret to the plaintiff's business; (4) the nature and extent of the use the

able royalty is the best measure of damages in a case where the alleged thief made no profits.[8]

defendant intended for the secret; (5) whatever other unique factors in the particular case might have affected the parties' agreement, such as the ready availability of alternative processes. *See Vermont Microsystems I*, 88 F.3d at 151–52.

The jury may also consider the following factors, which are adapted from the factors listed in *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), *modified and aff'd*, 446 F.2d 295, 296 (2d Cir.1971):

1. The royalties received by the plaintiff for the licensing of the trade secrets to others, which may prove an established royalty;

2. The rates paid by the defendant for the use of other trade secrets comparable to the trade secret in suit;

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4. The plaintiff's established policy and marketing program to maintain its trade secret by not licensing others to use the invention or by granting licenses under special conditions designed to preserve the trade secret;

5. The commercial relationship between the plaintiff and defendant, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter;

6. The effect of selling the trade secret product in promoting sales of other products of the defendant; the existing value of the trade secret to the plaintiff as a generator of sales of its non-trade secret items; and the extent of such derivative or connected or conveyed sales;

7. The duration of the trade secret and the term of the license;

8. The established profitability of the product made with the trade secret; its commercial success; and its current popularity;

9. The utility and advantages of the trade secret over the old modes or devices, if any, that had been used for working out similar results;

10. The nature of the trade secret; the character of the commercial embodiment of it as owned or produced by the plaintiff; and

the benefits to those who have used the trade secret;

11. The extent to which the defendant has made use of the trade secret; and any evidence probative of the value of that use;

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the trade secret or analogous trade secrets;

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-trade secret elements, the manufacturing process, business risks, or significant features or improvements added by the defendant;

14. The opinion testimony of qualified experts;

15. The amount that the plaintiff and the defendant would have agreed upon (at the time the misappropriation began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the trade secret—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent licensor who was willing to grant a license.

8. Fujitsu argues that the reasonable royalty method should be used in situations "only where the defendant [has] destroyed the value of the secret." *Softel, Inc. v. Dragon Med. and Scientific Communications, Inc.*, 118 F.3d 955, 969 (2d Cir.1997) (citing *University Computing*, 504 F.2d at 535). Defendant, however, misreads *Softel* by paraphrasing its holding without explaining it in context. In *Softel*, the court rejected the plaintiff's proposed measure of damages because it relied on one problematic factor—the total value of the trade secret to plaintiff. *See id.* The court found that the total value of the secret could not be awarded to the plaintiff because the secret had not been destroyed and the plaintiff retained use of the secret. *See id.; see also University Computing*, 504 F.2d at 535. If the jury finds that LinkCo retains its trade secret, despite Fujitsu's misappropriation, then LinkCo cannot be awarded the total val-

## C. Form of Royalty

▇▇▇ A reasonable royalty may be computed in various ways, including a lump-sum royalty based on expected sales or a running royalty based on a percentage of actual sales. The choice of the proper form of the royalty is dependent upon what would have been the most likely agreement during the hypothetical negotiation. A jury may award damages based on a lump-sum if there is sufficient evidence that lump-sum license structures are common in the industry. *See Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1359–60 (Fed.Cir.1998) (permitting a lump-sum license structure where plaintiff produced sufficient evidence that lump-sum license structure was common in the industry); *Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 519 (Fed.Cir. 1995) (reversing a reasonable royalty damage award based on upfront royalty where industry practice did not include upfront licensing fees); *Endress & Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 892 F.Supp. 1123, 1131 (S.D.Ind.1995) ("[I]n calculating a reasonable royalty rate, the court 'must design a methodology for the hypothetical negotiation that comports with industry practice.'") (quoting *Johns–Manville Corp. v. Guardian Indus. Corp.*, 718 F.Supp. 1310, 1315 (E.D.Mich.1989)). Although Fujitsu and LinkCo disagree on the prevalence of lump-sum licence fees in the industry, the jury should decide whether there is sufficient evidence to warrant the award of a lump-sum or running royalty.

## III. ADMISSIBLE EVIDENCE

Having determined that the jury should be instructed to calculate a reasonable royalty award, LinkCo and Fujitsu raise a second dispute: Whether the jury can base its calculation on facts that were not known to the parties at the time of the hypothetical negotiation (*i.e.*, events that happened *after* the alleged misappropriation). Specifically, the parties dispute whether evidence of DisclosureVision's sales projections, actual sales, and profits—all of which happened after the trade secret was allegedly infringed—are relevant to the jury's reasonable royalty calculation.

Courts have not adopted a bright-line rule for determining whether post-negotiation facts are relevant, and some opinions appear to be contradictory. *Compare Unisplay*, 69 F.3d at 518 n. 9 ("The trial court properly instructed the jury to base its verdict on actual sales, not projected sales.") *with Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed.Cir.2001) (recognizing "sales expectations at the time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales"). A simple bright-line rule would be to exclude all information that occurred after the meeting, including proof of post-negotiation sales projections, actual sales, or profits or the lack of profits. While this would be easy to apply, it would unfairly limit the proof, as more fully discussed before. This total exclusion rule may be the guiding principle, but decisions of whether to allow evidence of certain events occurring after the hypothetical meeting are peculiarly fact specific.

## A. Evidence Relevant to a Reasonable Royalty Award

### 1. Sales Projections

▇▇▇ An infringer's projected sales are often used as a basis for a reasonable

---

ue of the trade secret. Nevertheless, LinkCo can be awarded a reasonable royalty even if it retains the trade secret.

royalty when the projections would have been available at the time of the hypothetical negotiation. *See Interactive Pictures,* 274 F.3d at 1384; *Snellman v. Ricoh Co.,* 862 F.2d 283, 289 (Fed.Cir.1988); *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 899–900 (Fed.Cir.1986). Although these projections are not an exact measurement of a trade secret's value, these estimates are relevant to the parties' perceived value of the trade secret at the time of misappropriation. *See Interactive Pictures,* 274 F.3d at 1384; *Snellman,* 862 F.2d at 289; *TWM Mfg.,* 789 F.2d at 899–900. For example, in *Interactive Pictures,* the infringer's sales projections were created two months before the infringement began. As a result, the court held that a reasonable royalty could be based on these projections because "those projections would have been available to [defendant] at the time of the hypothetical negotiation" and were not outdated. *Interactive Pictures,* 274 F.3d at 1385.

In contrast, post-negotiation sales projections are an after-the-fact assessment that the negotiating parties could not have considered. These estimates do not reflect the parties perceived value of the trade secret during the negotiation. Therefore, sales projections are only relevant in a reasonable royalty calculation when they are available before the time of the misappropriation and would have been considered by the parties.

### 2. Actual Sales

While an infringer's actual sales are often used to determine damages, there are advantages and disadvantages to allowing this proof to be presented to a jury. On the one hand, when an infringer has not done well on the product developed through use of the trade secret, it argues that the only way to calculate the damages is to apply a reasonable royalty to the

actual sales. *See, e.g., Unisplay,* 69 F.3d at 516; *TWM Mfg.,* 789 F.2d at 899; *Nilssen v. Motorola, Inc. et al.,* No. 93 C 6333, 1998 WL 513090, *12–*13 (N.D.Ill. Aug.14, 1998). On the other hand, when an infringer has done very well on its sales, it argues that proof of the actual sales is prejudicial because the amount of actual sales could not have been anticipated at the time of the hypothetical negotiations. *See, e.g., Donnelly Corp. v. Gentex Corp.,* 918 F.Supp. 1126, 1139 (W.D.Mich.1996).

The victims, or plaintiffs, are equally mercurial. When the infringer's product has not done well in the market, the victims argue that the sales should not be presented to the jury because they occurred after the date of the hypothetical meeting and therefore do not reflect the value the infringer placed on the product at the time of the meeting. *See, e.g., Interactive Pictures,* 274 F.3d at 1384; *Snellman,* 862 F.2d at 289. The victims also argue that the actual sales are highly prejudicial because the infringer may have done a poor job of marketing the product. *See, e.g., Unisplay,* 69 F.3d at 515. When the product does well on the market, however, the victims argue that actual sales represent the best measure of damages. *See, e.g., Trans–World Mfg. Corp. v. Al Nyman & Sons, Inc.,* 750 F.2d 1552, 1566 (Fed.Cir.1984).

Each of these arguments has some merit and the case law on this issue reflects a high level of confusion and inconsistency. Occasionally, courts allow proof of actual sales and in other instances they do not. Apparently, no governing principle informs the court's decision. The key, of course, is what the parties would have believed to be the reasonable value of the alleged trade secret at the time it was stolen.

If, for example, the parties had produced sales projections prior to the theft, then those projections probably would

have governed the hypothetical negotiations because they would have informed the parties' discussion of the value of the alleged trade secrets. *See Interactive Pictures,* 274 F.3d at 1385. On the contrary, if there were no projections at or before the date of the hypothetical negotiations, then a court is more likely to conclude that the parties would have set the royalty rate at the meeting but agreed that this rate would be applied to actual sales. *See, e.g., Nilssen,* 1998 WL 513090, *12–*13. In between these two extremes, might be cases in which the parties had sufficient information, aside from projections, to have agreed on a lump-sum purchase price for the alleged trade secret, which does not apply a royalty rate to either sales projections of actual sales. Accordingly, the decision as to whether actual sales should be admitted turns on the facts of the particular case.

### 3. Lack of Profits

A reasonable royalty may also be based on the infringer's profits. *See Trans–World,* 750 F.2d at 1568 ("Evidence of the infringer's profits generally is admissible as probative of his anticipated profits."); *see also Donnelly,* 918 F.Supp. at 1139; *Fromson v. Citiplate, Inc.,* 699 F.Supp. 398, 407 (E.D.N.Y.1988), *aff'd,* 886 F.2d 1300 (Fed.Cir.1989). It is not surprising that when the infringer has profited from its wrongful use of a competitor's intellectual property, and sometimes quite handsomely, the injured party urges that those profits reflect the damages it has suffered. Many cases recognize this self-evident proposition. *See, e.g., Trans–World,* 750 F.2d 1552; *Donnelly,* 918 F.Supp. 1126; *Fromson,* 699 F.Supp. 398.

The situation is entirely different when the infringer has not profited from its wrongful conduct. The absence of profits does not preclude the victim from obtain-

ing damages based on the loss of its intellectual property. *See In re Cawood Patent,* 94 U.S. at 710; *University Computing,* 504 F.2d at 536; *Computer Assocs. Int'l v. American Fundware, Inc.,* 831 F.Supp. 1516, 1527 (D.Colo.1993); *Structural Dynamics Research Corp. v. Engineering Mechs. Research Corp.,* 401 F.Supp. 1102, 1119 (E.D.Mich.1975). Indeed, that is the genesis of the damage calculation based on the hypothetical negotiation at the time of misappropriation. *See Vermont Microsystems II,* 138 F.3d at 450 (affirming trial court's application of reasonable royalty doctrine because evidence of infringer's profits was too imprecise); *University Computing,* 504 F.2d at 536–38 (applying a reasonable royalty where infringer did not make a profit). These cases demonstrate that when there are no profits, an event that the parties could not have anticipated at the time of the hypothetical negotiations, admission of this evidence would be highly prejudicial to the victim of the alleged infringement. The intellectual property had a theoretical value at the time it was stolen. There are many reasons why the infringer may not have profited once it commercialized the idea and sold the product. These intangible factors, such as the infringer's efficiency in bringing the product to market, the quality of its product and its marketing efforts, all contribute to the conclusion that proof of no profits by the infringer is unreliable, highly prejudicial, and inadmissible.

### B. Fujitsu's Projections, Sales and Profits

#### 1. Sales Projections

Fujitsu's DisclosureVision sales projections were created in December 1998 and October 1999. *See* Amendment to Aron Levko's [Plaintiff's Expert] Initial Expert Report at 4. Levko relied on these

projections to calculate a proposed reasonable royalty. *See id.* LinkCo argues that these projections are probative of Fujitsu's valuation of LinkCo's technology at the time of the alleged misappropriation in 1997. *See* Pl. Mem. at 14.

Fujitsu's projections would be admissible if they were created near the time of the hypothetical negotiation and if it were probable that the parties would have considered the figures during their negotiations. *See Interactive Pictures,* 274 F.3d at 1385; *Snellman,* 862 F.2d at 289. However, the projections were not available until several months after the hypothetical negotiation. Therefore, it is impossible for the parties to have considered these projections at the time of the hypothetical negotiation. Although the parties could have agreed on a lump-sum royalty based on expected sales, Fujitsu's projections are not evidence of expected sales at the time of the negotiation. LinkCo must establish expected sales with evidence available to the parties before the alleged theft. As a result, Fujitsu's sales projections are inadmissible to prove damages because they are irrelevant, highly prejudicial to Fujitsu, and would tend to mislead the jury. *See Riles v. Shell Exploration and Prod. Co.,* 298 F.3d 1302, 1313 (Fed.Cir.2002).[9]

### 2. Actual Sales

■■ According to Fujitsu, the parties would have negotiated a running royalty to be applied against actual sales. Although actual sales were not known until after the negotiation, the form of the reasonable royalty is an issue of fact and Fujitsu may present its running royalty theory to the jury. *See supra* Part II.C. In order to permit Fujitsu to present its proposed damages calculation, the running royalty must be applied to actual sales because there is no proof of reliable sales projections. *See supra* Part III.A.2. LinkCo, however, will then be permitted to prove that these sales figures are misleading because of the way in which Fujitsu commercialized and/or marketed the product and may further present evidence as to what it believes the sales would have been had it brought its own product to market.

### 3. Lack of Profits

■■ Fujitsu claims that because it had expenses of $10 million, it made no profits on its sales of DisclosureVision. *See* 10/7/02 Trial Tr. at 265. Fujitsu argues that its lack of profits is relevant to both the measure of damages and to the value of the trade secret. Applying the balancing test of Rule 403 of the Federal Rules of Evidence, this evidence must be precluded. Profits can be considered in a reasonable royalty calculation. However, lack of profits is not admissible because it is unfairly prejudicial to LinkCo and would defeat the purpose of a reasonable royalty measure of damages.

## IV. PRE–JUDGMENT INTEREST

The final issue raised by the parties is whether pre-judgment interest is mandatory or discretionary. Pursuant to the New York Civil Practice Law and Rules, pre-judgment interest is mandatory for a damage award, except when the action is equitable in nature. *See* N.Y. C.P.L.R. § 5001(a) (McKinney 2002). When the action is equitable, pre-judgment interest is left to the court's discretion. *Id.*

---

**9.** The projections were admitted for the limited purpose of explaining Fujitsu's motive to engage in the alleged misconduct. They were also admitted in response to Fujitsu's actual sales figures—again, solely with respect to Fujitsu's motive. *See* 10/15/02 Trial Tr. at 1539–42.

■ Whether a trade secret misappropriation claim is legal or equitable has not been clearly decided. Decisions addressing this issue suggest that trade secret misappropriation claims can be either equitable or legal in nature.[10] However, a close reading of these cases reveals that trade secret misappropriation claims are equitable in nature only when plaintiffs are seeking injunctive relief. *See, e.g., Speedry*, 306 F.2d at 330; *Protexol Corp.*, 12 F.R.D. at 8.

■ Where a plaintiff seeks damages for trade secret misappropriation, rather than equitable relief, the claim is essentially legal in nature. *See Softel*, 891 F.Supp. at 943; *Spiselman*, 61 N.Y.S.2d at 141.[11] Because LinkCo is seeking damages, its misappropriation claim is an action at law and pre-judgment interest is mandatory.

## V. CONCLUSION

For the reasons discussed above, the appropriate measure of damages for plaintiff's misappropriation of trade secrets claim, where defendant did not profit from the alleged infringement, is a reasonable royalty. Depending on the evidence presented at trial, the royalty may result in a lump-sum payment based on a reasonable royalty as applied to expected sales or a running royalty based on actual sales. If

damages are awarded, pre-judgment interest is mandatory under New York law because a claim for damages is legal in nature.

SO ORDERED:

---

10. *See Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 330 (2d Cir.1962) ("Plaintiff's [trade secret] claim is correctly based upon 'equitable principles.'"); *Softel, Inc. v. Dragon Med. and Scientific Communications, Inc.*, 891 F.Supp. 935, 943 (S.D.N.Y.1995)(holding that "[b]ecause plaintiff's claim for damages for trade secret misappropriation is essentially legal in nature, prejudgment interest on the trade secret damages must be awarded") *aff'd*, 118 F.3d 955 (2d Cir.1997); *Protexol Corp. v. Koppers Co.*, 12 F.R.D. 7, 8 (S.D.N.Y.1951)("The trade secret ... claims are essentially equitable in nature."); *Spiselman v. Rabinowitz*, 270 A.D.

548, 61 N.Y.S.2d 138, 141 (1st Dep't 1946)(holding that when a party's trade secret is misappropriated, "he is not bound to seek a remedy in a court of equity to terminate the wrong, but, if he so elects, may bring an action at law to recover money damages for the injury").

11. The legal nature of a trade secret misappropriation claim is also evident from the right to a jury trial in these actions. *See, e.g., Electro–Miniatures Corp.*, 771 F.2d at 27 (affirming jury verdict in a misappropriation of trade secrets case).