E.J. Brooks Co. v Cambridge Sec. Seals (2018 NY Slip Op 03171)

E.J. Brooks Co. v Cambridge Sec. Seals

2018 NY Slip Op 03171 [31 NY3d 441]

May 3, 2018

Feinman, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, August 29, 2018

[*1]

E.J. Brooks Company, Doing Business as TydenBrooks, Appellant-Respondent,
v
Cambridge Security Seals, Respondent-Appellant.

Argued February 8, 2018; decided May 3, 2018

{**31 NY3d at 444} OPINION OF THE COURT

Feinman, J.

The United States Court of Appeals for the Second Circuit has asked us to decide "[w]hether, under New York law, a plaintiff asserting claims of misappropriation of a trade secret, unfair competition, and unjust enrichment can recover damages that are measured by the costs the defendant avoided due to its unlawful activity" (E.J. Brooks Co. v Cambridge Sec. Seals, 858 F3d 744, 752 [2d Cir 2017]). Under our common law, compensatory damages must return the plaintiff, as nearly as possible, to the position it would have been in had the wrongdoing not occurred—but do no more. Accordingly, we answer this question in the negative.[FN1] [*2]I.
E.J. Brooks Company d/b/a TydenBrooks is the largest manufacturer of plastic indicative security seals in the United States. TydenBrooks acquired Stoffel Seals Corporation, and thereafter came into possession of Stoffel's fully-automated process for manufacturing plastic indicative security seals. According to TydenBrooks, several Stoffel/TydenBrooks employees defected to a rival manufacturer, Cambridge Security Seals (CSS), bringing the confidential Stoffel process with them. In 2012, TydenBrooks brought an action in the United States District Court for the Southern District of New York against CSS and those former employees, asserting causes of action based on, inter alia, common-law misappropriation of trade{**31 NY3d at 445} secrets, unfair competition and unjust enrichment.[FN2] Following a jury trial, CSS was found liable under all three of these theories.
On the issue of damages, TydenBrooks sought to measure its injury by the costs CSS avoided as a result of its unlawful activity. Under this "avoided costs" theory, TydenBrooks sought monetary relief in an amount equal to the difference between the costs CSS actually incurred in developing and using the TydenBrooks' manufacturing process and the costs that CSS would have incurred had it not misappropriated TydenBrooks' process. At trial, TydenBrooks' damages expert testified that CSS would have had to incur an additional $6.1 million to $12.2 million, at a minimum, to develop the manufacturing process for its first-generation machines without making use of its knowledge of TydenBrooks' information.[FN3]
TydenBrooks did not present any evidence, or otherwise argue, that CSS's avoided costs could be a proxy for its own losses (such as its investment losses). Instead, CSS's avoided costs were presented exclusively as a measure of the benefit CSS derived from the misappropriation, which TydenBrooks asserted was its per se measure of damages. Specifically, TydenBrooks' expert testified that, among the three theories of damages he was familiar with—"lost profits," "disgorgement of unjust gains" and "reasonable royalty damages"—his avoided cost calculation was a "type of disgorgement," which he explained was a measure of how much a company "gain[ed] by taking and using information that didn't belong to them." TydenBrooks consistently took the position, both before and during trial, that its own financial losses were irrelevant to its "avoided costs" theory of damages. For instance, TydenBrooks brought motions in limine to, among other things, exclude evidence that any customers it lost to CSS were due to factors other than CSS's misappropriation. The court granted the motions, holding that such evidence was irrelevant because "TydenBrooks is not claiming damages from the loss of customers," but rather, "based on the idea that, by stealing Tyden{**31 NY3d at 446}Brooks' trade secrets, CSS was able to avoid development costs . . . ."
At the close of trial, the court charged the jury on damages based solely on an avoided costs theory:
"In evaluating cost savings, you are to use the standard of comparison method. Under this method, you are to compare actual costs incurred by the defendant you are considering with the costs it would have incurred to produce the same products without the use and knowledge of TydenBrooks' manufacturing process. . . . The difference between the costs actually incurred by the defendant you are considering and the amount he would have incurred in the absence of the misappropriation and/or unfair use is the amount of damages that you should award to TydenBrooks."
The court reminded the jury that it "may award compensatory damages only for injuries that TydenBrooks prove[d] were proximately caused by a defendant's allegedly wrongful conduct" and "only for those injuries that TydenBrooks has [*3]actually suffered or which it is reasonably likely to suffer in the near future." However, the court did not explain how the jury could make the inference that CSS's avoided costs approximated the losses that TydenBrooks "actually suffered" or was reasonably likely to suffer in the near future. Separately, the court instructed the jury that if it found CSS liable for compensatory damages, it may award punitive damages, "[t]he purpose of [which] is not to compensate a plaintiff but to punish a defendant for wanton and reckless or malicious acts and thereby to discourage the defendant and other people or companies from acting in a similar way in the future."
The jury returned a verdict finding CSS liable for trade secret misappropriation, unfair competition and unjust enrichment. It assessed $1.3 million against CSS in "compensatory damages" on each claim, for a total of $3.9 million against CSS in compensatory damages. The jury did not award punitive damages.
Both parties filed postjudgment motions. First, TydenBrooks moved to amend the judgment to include prejudgment interest under CPLR 5001 (a), which the court denied (see E.J. Brooks Co. v Cambridge Sec. Seals, 2015 WL 9694522, 2015 US Dist {**31 NY3d at 447}LEXIS 174444 [SD NY, Dec. 22, 2015, No. 12-CV-2937 (LAP)]).[FN4] Second, CSS moved for judgment as a matter of law or a new trial or, in the alternative, to alter or amend the judgment, on the grounds that, among other things, avoided costs was an improper measure of damages. The court denied CSS's motion, holding that "the amount of damages recoverable in an action for misappropriation of trade secrets may be measured either by the plaintiff's losses . . . or by the profits unjustly received by the defendant" (E.J. Brooks Co. v Cambridge Sec. Seals, 2015 WL 9704079, *4, 2015 US Dist LEXIS 174447, *12 [SD NY, Dec. 23, 2015, No. 12-CV-2937 (LAP)] [citations and internal quotation marks omitted]). The court held that avoided costs could be awarded as damages under either measure; that is, avoided costs could either measure the defendant's gains or, alternatively, the plaintiff's losses (see 2015 WL 9704079, *4-6, 2015 US Dist LEXIS 174447, *11-18).
The parties cross-appealed the District Court's denial of their respective motions to the Second Circuit. With respect to the avoided costs issue raised in CSS's motion, the Second Circuit noted that "neither [the Second Circuit] nor the New York courts appear to have approved the specific type of award in this case" (E.J. Brooks, 858 F3d at 750). On the one hand, the court acknowledged that the Restatement (Third) of Unfair Competition and Second Circuit precedent "commend[ ] using the amount of avoided costs as a measure of damages in unfair competition cases" (id. at 749; see Matarese v Moore-McCormack Lines, 158 F2d 631 [2d Cir 1946]; Restatement [Third] of Unfair Competition § 45, Comments d, f). On the other hand, the court noted that "New York courts have suggested that the measure of damages in trade secret cases, even when measured by reference to a defendant's profits, should correspond to a plaintiff's losses as a means of compensation" (E.J. Brooks, 858 F3d at 750; see Suburban Graphics Supply Corp. v Nagle, 5 AD3d 663, 666 [2d Dept 2004]; Hertz Corp. v Avis, Inc., 106 AD2d 246 [1st Dept 1985]), a proposition that the court deemed "contrary" to "the specific type of award in this case" (E.J. Brooks, 858 F3d at 750). "Assuming New York requires that trade secret damages bear some connection to the plaintiff's losses," {**31 NY3d at 448}the Second Circuit conceded that "it is not apparent . . . that assessing damages based on the defendant's avoided costs satisfies the requirement" (id.). With respect to the prejudgment interest issue, the Second Circuit likewise stated that New York law was inconclusive as to whether prejudgment interest would be "mandatory" on the damages award in this case (id. at 750-751).
Accordingly, the Second Circuit certified the following questions:
"1. Whether, under New York law, a plaintiff asserting claims of misappropriation of a trade secret, unfair competition, and unjust enrichment can recover damages that are measured by the costs the defendant avoided due to its unlawful activity.
[*4]
"2. If the answer to the first question is 'yes,' whether prejudgment interest under [CPLR] 5001(a) is mandatory where a plaintiff recovers damages as measured by the defendant's avoided costs." (Id. at 752.)
The Court accepted these questions on June 27, 2017 (see 29 NY3d 1045 [2017]).
II.
We turn first to the question of whether avoided costs are awardable as compensatory damages in an action based on a theory of unfair competition.
The "fundamental purpose" of compensatory damages is to have the wrongdoer "make the victim whole" (Sharapata v Town of Islip, 56 NY2d 332, 335 [1982]; see Ross v Louise Wise Servs., Inc., 8 NY3d 478, 489 [2007]; Matter of Rothko, 43 NY2d 305, 322 [1977]). "Put another way, these measure fair and just compensation, commensurate with the loss or injury sustained from the wrongful act" (Sharapata, 56 NY2d at 335 [citations and internal quotation marks omitted]; see also Steitz v Gifford, 280 NY 15, 20 [1939] ["The damages must be compensatory only" and must result "directly from and as a natural consequence of the wrongful act"]). "The goal is to restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred" (McDougald v Garber, 73 NY2d 246, 254 [1989]). "The damages cannot be remote, contingent or speculative. They need not be immediate, but need to be so near to the cause only that they may be{**31 NY3d at 449} reasonably traced to the event . . . ." (Steitz, 280 NY at 20.) The standard is not one of "mathematical certainty" but only "reasonable certainty" (id.).
 Such is the rule in unfair competition cases. Damages must correspond to "the amount which the plaintiff would have made except for the defendant's wrong . . . , not the profits or revenues actually received or earned" by the defendant (McRoberts Protective Agency v Lansdell Protective Agency, 61 AD2d 652, 655 [1st Dept 1978] [citations and internal quotation marks omitted]; see David Fox & Sons v King Poultry Co., 30 AD2d 789, 790-791 [1st Dept 1968, Eager, J., dissenting], mod on dissenting op below 23 NY2d 914 [1969], rearg denied 24 NY2d 896 [1969]; Santa's Workshop v Sterling, 2 AD2d 262, 267 [3d Dept 1956], affd 3 NY2d 757 [1957]). Another way of stating this rule is that damages in unfair competition cases should correspond to "plaintiff's losses [that] were a proximate result of defendants' conduct" (Duane Jones Co. v Burke, 306 NY 172, 191 [1954]).
Here, CSS was found liable to TydenBrooks under a "misappropriation theory" of unfair competition. Under the "misappropriation theory" of unfair competition, a party is liable if they unfairly exploit "the skill, expenditures and labors" of a competitor (ITC Ltd. v Punchgini, Inc., 9 NY3d 467, 476-477 [2007]; Electrolux Corp. v Val-Worth, Inc., 6 NY2d 556, 567-568 [1959]). The essence of the misappropriation theory is not just that the defendant has "reap[ed] where it has not sown," but that it has done so in an unethical way and thereby unfairly neutralized a commercial advantage that the plaintiff achieved through "honest labor" (International News Service v Associated Press, 248 US 215, 236, 239-240 [1918]).[FN5] Damages, therefore, must be measured by the loss of the plaintiff's commercial advantage, which may not correspond to what the defendant has wrongfully gained (see Electrolux, 6 NY2d at 571-572; Victor G. Reiling Assoc. v Fisher-Price, Inc., 2006 WL 1102754, 2006 US Dist LEXIS 22813 [D Conn, Apr. 25, 2006, No. 3:03CV222(JBA)] [applying New York law], reconsideration denied 463 F Supp 2d 177 [D Conn 2006]). "What is true of all {**31 NY3d at 450}actions, [and] is especially true in a suit for unfair competition[, is that] disposition of each case peculiarly depends upon the precise state of [*5]facts disclosed" (Electrolux, 6 NY2d at 571 [citations and internal quotation marks omitted]), particularly since proof of damages for unfair competition is "especially complicated" where the injury only affects intangible values (6 Callmann on Unfair Competition, Trademarks & Monopolies § 23:66 [4th ed]). However, the principle that a plaintiff's losses may be measured practically and flexibly does not remove the requirement that damages be measured by the plaintiff's actual losses (see Electrolux, 6 NY2d at 572).
To be sure, courts may award a defendant's unjust gains as a proxy for compensatory damages in an unfair competition case (see Underhill v Schenck, 238 NY 7, 17 [1924]; Epstein Eng'g, P.C. v Cataldo, 124 AD3d 420, 421 [1st Dept 2015]). However, "[t]he accounting for profits under such circumstances is not in lieu of . . . damages, but is a method of computing damages" (Ronson Art Metal Works v Gibson Lighter Mfg. Co., 3 AD2d 227, 230 [1st Dept 1957] [emphasis added], rearg denied 3 AD2d 833 [1st Dept 1957], mot to cancel and discharge undertaking denied 7 AD2d 897 [1st Dept 1959], quoting Biltmore Publ. Co., Inc. v Grayson Publ. Corp., 272 App Div 504, 507 [1st Dept 1947]). Such a computation of damages may be appropriate where a plaintiff's actual losses cannot "be traced with even approximate precision," but even in those cases it must first be shown that there is "some approximate relation of correspondence, a causal relation not wholly unsubstantial and imaginary, between the gains of the aggressor and those diverted from his [or her] victim" (Underhill, 238 NY at 17-18; accord Harry R. Defler Corp. v Kleeman, 19 AD2d 396, 403 [4th Dept 1963]). Without evidence of that correspondence, "[t]here is no presumption of law or of fact" that what a defendant has gained will competently measure what the plaintiff has lost (Michel Cosmetics, Inc. v Tsirkas, 282 NY 195, 202 [1940], quoting Dickinson v O. & W. Thum Co., 8 F2d 570, 575 [6th Cir 1925]). Furthermore, if a plaintiff seeks to establish an inference that its compensable losses are linked to the value of the defendant's gains, then the defendant must be afforded an opportunity to challenge the link with its own rebuttal evidence (see Hyde Park Prods. Corp. v Lerner Corp., 65 NY2d 316, 322 [1985]).
In Michel Cosmetics (282 NY 195), the defendants stole the plaintiff's manufacturing process for making lipsticks and{**31 NY3d at 451} packaged and sold the products in the same containers that the plaintiff used, "with the object of deceiving buyers into the belief that they were buying the product of the plaintiff" (see id. at 197-198). The trial court ordered the defendants to pay plaintiffs "all profits . . . on the lipsticks manufactured and sold by defendants . . . [as] if said lipsticks had been manufactured and sold by plaintiff" (id. at 198 [emphasis added]).[FN6] This Court held that the measure of damages was overbroad. The Court stated that
"[t]he wrong inflicted upon the plaintiff is analogous to the wrong suffered by an owner through infringement of his patent or trade-mark, and the rule of damages is similar. An infringer must compensate the owner of a trade-mark, a patent, a process or a formula for the profits which the owner would have acquired in [the owner's] business except for such infringement" (id. at 200).
The Court acknowledged that, "if the plaintiff would otherwise have made the sales of lipsticks which in fact the defendants made by the use of plaintiff's formulas," then the plaintiff would be "entitled to recover from the defendants [such] amount of the profits" (id.). However, the Court observed that there was insufficient evidence that the defendant's customers actually overlapped with the plaintiff's, noting in particular that the defendants distributed the products in countries where the plaintiff was not even marketing them (see id. at 200-201). When a plaintiff "seeks to recover damages," the Court held that "the burden is on him to prove by competent and sufficient evidence his lost sales, or that he was compelled to reduce prices as the result of his competitor's wrongful conduct" (id. at 202). Because the evidence in Michel Cosmetics was "insufficient to justify an inference that the plaintiff would have made all the sales actually made by the defendants," the Court remitted for a new trial on damages (id. at 204).{**31 NY3d at 452}
[*6]
In Hyde Park (65 NY2d 316), the defendant who wrongfully solicited customers away from the plaintiff was found liable for unfair competition. The trial court awarded damages equal to the profits that the defendant made by selling to the plaintiff's customers (see id. at 320). We held that this was error and that the defendants should have been permitted to introduce evidence that, among other things, the defendant's customers were no longer customers of the plaintiff at the time the defendant made its sales, or that they were bulk buyers whose orders could not entirely have been fulfilled by the plaintiff (see id. at 322). Sales to such customers, we held, should have been excluded from the damages award, since they did not rationally relate to any "lost opportunity for profit" caused by the solicitation (id.).
Michel Cosmetics and Hyde Park establish that, while a defendant's gains may be evidence of a plaintiff's losses, they will not be presumed to be the actual measure of a plaintiff's losses. Otherwise, damages would "cease[ ] to serve the compensatory goals of tort recovery" (McDougald, 73 NY2d at 254). The dissent notes, correctly, that neither Michel Cosmetics nor Hyde Park were about avoided costs. However, these cases signify more broadly that the measure of damages in a trade secret action must be designed, as nearly as possible, to restore the plaintiff to the position it would have been in but for the infringement. Whether those losses are measured by the defendant's profits, revenues, cost savings or any other measure of unjust gain, there is "no presumption of law or of fact" that such a figure will adequately approximate the losses incurred by the plaintiff (Michel Cosmetics, 282 NY at 202; see Electrolux, 6 NY2d at 571-572). A plaintiff therefore may not elect to measure its damages by the defendant's avoided costs in lieu of its own losses.
III.
We next turn to whether avoided costs are awardable as damages in trade secret actions. "A plaintiff claiming misappropriation of a trade secret must prove: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means" (Shaw Creations Inc. v Galleria Enters., Inc., 29 Misc 3d 1213[A], 2010 NY Slip Op 51813[U], *6 [Sup Ct, NY County 2010], quoting 
Integrated Cash Mgt. Servs., Inc. v Digital Transactions, Inc., 920 F2d 171, 173 [2d {**31 NY3d at 453}Cir 1990]). A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives [one] an opportunity to obtain an advantage over competitors who do not know or use it" (Ashland Mgt. v Janien, 82 NY2d 395, 407 [1993]). This Court has not definitively stated whether trade secret damages may be measured by avoided costs—or, for that matter, by any other measure of the defendant's own gains.
In Hertz Corp. v Avis, Inc. (106 AD2d 246 [1st Dept 1985]), the Appellate Division held that trade secret damages may not be measured by a defendant's increased profits, except to the extent that those profits are evidence of the plaintiff's own losses. There, the plaintiff alleged that a departing employee retained confidential documents and trade secrets (see id. at 247). Using these materials, the defendant was able to "reverse substantial business losses" and "correct operational deficiencies" (id.). The plaintiff abandoned any allegation that the use of its trade secrets had caused it any harm; instead, the plaintiff sought to measure "damages" exclusively by the defendant's profits (id. at 248-250). The trial court granted the plaintiff's discovery request for the defendant's financial statements, and the Appellate Division reversed. Because the plaintiff conceded that it suffered no harm, the defendant's financials were "irrelevant to [its] claim for damages" (id. at 249). Relying largely on unfair competition cases, where recovery is limited to a plaintiff's own losses (see part II, supra), the Court stated that the plaintiff was only "entitled to recover as damages the amount of loss sustained by it, including opportunities for profit on the accounts diverted from it through defendants' conduct" (id. at 251, quoting Duane Jones Co., 306 NY at 192).
Trade secret cases following Hertz have generally adhered to this holding (see Equity Now, Inc. v Wall St. Mtge. Bankers, Ltd., 98 AD3d 909, 909 [1st Dept 2012] ["Plaintiff was entitled to damages for the profits it lost as a result of defendant's conduct"], lv denied 21 NY3d 854 [2013]; Suburban Graphics Supply Corp. v Nagle, 5 AD3d 663, 666 [2d Dept 2004] ["The measure of damages for 'unfair competition and the misappropriation and exploitation of confidential information is the loss of profits sustained by reason of the improper conduct' "]; Allan Dampf, P. C. v Bloom, 127 AD2d 719, 720 [2d Dept 1987] [same]; Feinberg v Poznek, 12 Misc 3d 1185[A], 2006 NY Slip Op 51456[U], *4 [Sup Ct, NY County 2006]; 
Robert Plan Corp.{**31 NY3d at 454} 
v Onebeacon Ins., 10 Misc 3d 1053[A], 2005 NY Slip Op 51940[U] [Sup Ct, Nassau County 2005]; Hair Say, Ltd. v Salon Opus, Inc., 6 Misc 3d 1041[A], 2005 NY Slip Op 50382[U], *9 [Sup Ct, Nassau County 2005]).
[*7]We agree that damages in trade secret actions must be measured by the losses incurred by the plaintiff, and that damages may not be based on the infringer's avoided development costs. Authorities embracing the avoided cost method of damages almost universally consider them a measure of the defendant's unjust gains, rather than the plaintiff's losses (see e.g. GlobeRanger Corp. v Software AG United States of Am., Inc., 836 F3d 477, 499 [5th Cir 2016]; G.S. Rasmussen & Assoc., Inc. v Kalitta Flying Serv., Inc., 132 F3d 39 [9th Cir, Dec. 11, 1997] [table; text at 1997 WL 774869, *2, 1997 US App LEXIS 34884, *4-6 (1997)]; Litton Sys., Inc. v Ssangyong Cement Indus. Co., Ltd., 107 F3d 30 [Fed Cir, Feb. 13, 1997] [table; text at 1997 WL 59360, *8, 1997 US App LEXIS 2386, *21-23 (1997)]; Salsbury Labs., Inc. v Merieux Labs., Inc., 908 F2d 706, 714-715 [11th Cir 1990]). This calculation of damages, however, does not consider the effect of the misappropriation on the plaintiff. Because this figure is tied to the defendant's gains rather than the plaintiff's losses, it is not a permissible measure of damages.
It is true that, in trade secret cases, "loss" is broadly defined and must account for the fact that trade secrets inherently derive their value from their confidentiality. The plaintiff's injury in trade secret misappropriation cases includes the loss of "competitive advantage over others . . . by virtue of its exclusive access" to the secret (Ruckelshaus v Monsanto Co., 467 US 986, 1012 [1984]). Where disclosure of a trade secret has "destroy[ed] that competitive edge" (id.), the plaintiff's costs of developing the product may be the best evidence of the (now-depleted) value that the plaintiff placed on the secret (see W.L. Gore & Associates, Inc. v GI Dynamics, Inc., 872 F Supp 2d 883, 892 [D Ariz 2012]; In re Cross Media Mktg. Corp., 2006 WL 2337177, *6, 2006 US Dist LEXIS 56112, *15-18 [SD NY, Aug. 11, 2006, No. 06 Civ. 4228(MBM)]; LinkCo, Inc. v Fujitsu Ltd., 232 F Supp 2d 182, 185 [SD NY 2002]). However, it is neither automatically nor presumptively the case that the costs avoided by the defendant will be an adequate approximation of the plaintiff's investment losses, any more than it can be presumed that the defendant's sales would approximate those of the plaintiff (see Michel Cosmetics, 282 NY at 202). Indeed, the{**31 NY3d at 455} cases cited by TydenBrooks show the opposite: that the plaintiff's actual development costs will commonly be used as a proxy for the defendant's saved development costs (under a damages regime that permits recovery of unjust gains) (see e.g. GlobeRanger, 836 F3d at 499-500; University Computing Co. v Lykes-Youngstown Corp., 504 F2d 518, 538 [5th Cir 1974]). This is only logical; the plaintiff's actual development costs have actually been incurred and are known, whereas the defendant's avoided costs, by definition, are hypothetical. Flipping this formula—measuring the plaintiff's actual expenditures, a known quantity, by the defendant's projected expenditures, an unknown one—is precisely the kind of "wholly unsubstantial and imaginary" nexus that Judge Cardozo warned of in Underhill (238 NY at 17-18).
IV.
Finally, the certified question asks us whether avoided costs may be awarded as compensatory damages in an unjust enrichment action. We have stated that, in order to sustain an unjust enrichment claim, "[a] plaintiff must show that (1) the other party was enriched, (2) at [the plaintiff's] expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered" (Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 182 [2011] [internal quotation marks omitted]). However, this doctrine is a narrow one; it is "not a catchall cause of action to be used when others fail" (Corsello v Verizon N.Y., Inc., 18 NY3d 777, 790 [2012]). Unjust enrichment, or an action in quasi contract,
"is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled" (id.).
In such circumstances, equity merely intervenes to deem the parties privy to each other (see Miller v Schloss, 218 NY 400 [1916]). "The contract is a mere fiction, a form imposed in order to adapt the case to a given remedy . . . . The law creates it, regardless of the intention of the parties, to assure a just and equitable result" (Clark-Fitzpatrick, Inc. v Long Is. R.R. {**31 NY3d at 456}Co., 70 NY2d 382, 388-389 [1987], quoting Bradkin v Leverton, 26 NY2d 192, 196 [1970]).[FN7]
IDT Corp. v Morgan Stanley Dean Witter & Co. (12 NY3d 132, 142 [2009]) is [*8]instructive. There, the plaintiff, IDT, brought an unjust enrichment action (among other causes of action) against its former advisor, Morgan Stanley, alleging that Morgan Stanley used its intimate knowledge of IDT's confidential business and financial information in order to induce a third party, Telefonica, to breach a contract with IDT (see id. at 136-139). Under the contract in question, IDT would have acquired a 10% stake in the operations of SAm-1, a large undersea fiber-optic cable, as the anchor tenant of the cable network (see Morgan Stanley v IDT Corp., 2006 NY Slip Op 30076[U] [Sup Ct, NY County, Apr. 10, 2006], affd 45 AD3d 419 [1st Dept 2007], revd 12 NY3d 132 [2009]). IDT alleged that Morgan Stanley misappropriated its confidential information and induced the breach so that it could earn substantial investment banking fees replacing IDT as anchor tenant (see id.). We held that the unjust enrichment claim could not "support the disgorgement of any profits Morgan Stanley obtained from Telefonica or other companies, in connection with SAm-1" (IDT, 12 NY3d at 142). "In seeking Morgan Stanley's profits from SAm-1, IDT [did] not, and [could] not, allege that Morgan Stanley [had] been unjustly enriched at IDT's expense, because IDT did not pay the alleged fees" (id. [emphasis added]). Though Morgan Stanley may have been enriched, and though IDT may have been injured in other ways, recovery of the third-party fees was denied because there was no impairment of any preexisting right to the fees.
 Similarly, where a defendant saves, through its unlawful activities, costs and expenses that otherwise would have been{**31 NY3d at 457} payable to third parties, those avoided third-party payments do not constitute funds held by the defendant "at the expense of" the plaintiff. Therefore, a plaintiff bringing an unjust enrichment action may not recover as compensatory damages the costs that the defendant avoided due to its unlawful activity in lieu of the plaintiff's own losses.
V.
Accordingly, the first certified question should be answered in the negative and the second certified question not answered as unnecessary.

Wilson, J. (dissenting). This case was brought and tried in federal court, on three distinct theories of trade secret theft, unfair competition and unjust enrichment. The jury returned judgment for TydenBrooks, specifically finding that TydenBrooks "possessed a trade secret, identifiable with reasonable particularity, which was unlawfully misappropriated by [Cambridge Security Seals]"; that Cambridge Security Seals stole those secrets and used them for its own benefit, injuring TydenBrooks by that theft; that Cambridge Security Seals "engaged in unfair competition" with TydenBrooks; and that Cambridge Security Seals was "unjustly enriched, that is, that [Cambridge Security Seals] received a benefit at [TydenBrooks'] expense that, in equity and good conscience, [Cambridge Security Seals] should not retain." The United States Court of Appeals for the Second Circuit has asked us, and we have agreed to resolve, three questions of New York's law relating to damages: "Whether, under New York law, a plaintiff asserting claims of [1] misappropriation of a trade secret, [2] unfair competition, and [3] unjust enrichment can recover damages that are measured by the costs the defendant avoided due to its unlawful activity" (E.J. Brooks Co. v Cambridge Sec. Seals, 858 F3d 744, 752 [2d Cir 2017]).[FN1] Those certified questions do not ask whether this plaintiff may recover, but whether, as a matter of law, any plaintiff may recover a defendant's avoided costs on one or another of these three theories of liability. The majority answers the questions through a misguided bottoms up attempt to decide this plaintiff's case rather than a top-{**31 NY3d at 458}down approach announcing the principles of law. Not only does that approach produce an incorrect answer here, but it also forsakes New York's historic role at the vanguard. Where we should lead, we now refuse even to follow.
As to the Second Circuit's first question—whether avoided costs may form the basis of a damage award for trade secret misappropriation—the majority admits a vacuum in our decisional law. Instead of engaging with the unique nature of trade secret theft and the policy concerns at issue, the majority relies on several inapposite Appellate Division cases that discuss whether a plaintiff can be awarded defendant's profits as a measurement of damages; in none of the cited cases did plaintiffs seek avoided costs as damages. As to the second question, the majority misinterprets our prior case law to adopt an unnecessarily narrow interpretation of damages. In particular, the majority ignores our case law expressly allowing flexible recovery in equity. As to the third question, the majority tacitly concedes the absence of authority, again pointing to inapposite decisions.
The Second Circuit recognized not just the paucity of New York law on the questions it certified, but also the historically established common-law role of our Court, when framing the issue as an "unresolved policy decision," that our Court is "better situated" to make (858 F3d at 750). Our charge is to answer the question from the top down, looking to several basic principles. First, "the principle that there is no wrong without a remedy" (General Rubber Co. v Benedict, 215 NY 18, 23 [1915, Cardozo, J.]). Second, a successful plaintiff cannot be held to proof of damages with mathematical certainty; damages cannot be speculative, but must bear some reasonable relation to the injury (see Steitz v Gifford, 280 NY 15, 20 [1939] ["The fact that (damages) cannot be measured with absolute mathematical certainty does not bar substantial recovery if they may be approximately fixed"]; Duane Jones Co. v Burke, 306 NY 172, 192 [1954] ["when from the nature of the case the amount of the damages cannot be estimated [*9]with certainty, or only a part of them can be so estimated, no objection is perceived to placing before the jury all the facts and circumstances of the case having any tendency to show damages or their probable amount, so as to enable them to make the most intelligible and accurate estimate which the nature of the case will permit"]). Third, protectible intellectual property in whatever form, be it trade secret, patent, copyright, trademark or other, has a value{**31 NY3d at 459} greater than merely its development cost, and innovation depends on the ability of inventors to protect that property from theft (see Kewanee Oil Co. v Bicron Corp., 416 US 470, 482 [1974] [noting the "importance of trade secret protection to the subsidization of research and development"]; Gordon L. Doerfer, The Limits on Trade Secret Law Imposed by Federal Patent and Antitrust Supremacy, 80 Harv L Rev 1432, 1454 [1967] ["(trade secret law) protects independent innovators who will be encouraged to invent knowing that their work, if successful, will not be appropriated by others to their disadvantage"]).
Avoided costs are widely recognized as an available measure of damages in trade secret cases. They comport with each of the principles above. In both unfair competition actions and unjust enrichment actions, avoided-cost damages deprive the wrongdoer of its gain. As a policy matter, avoided-cost damages would often undercompensate plaintiffs, because no rational economic actor would spend $X to recover profits of merely $X (see LinkCo, Inc. v Fujitsu Ltd., 232 F Supp 2d 182, 186 [SD NY 2002] [opting for reasonable royalty where "losses measured solely by (plaintiff's) development costs would not adequately compensate the company for its loss of the potentially valuable trade secret"]; see also Christopher Rebel J. Pace, The Case for a Federal Trade Secrets Act, 8 Harv JL & Tech 427, 439 [1995] ["a business invest(s) in innovations that it can maintain in secrecy while exploiting the innovations to recover its expenses and, it is hoped, turn a profit"]). However, the calculation of avoided-cost damages is generally much simpler than, and less subject to challenge than, lost-profit damages, which makes them an attractive alternative for plaintiffs who are willing to forgo a potentially larger recovery in favor of a smaller, more certain one. I do not suggest that avoided-cost damages will always be the best measure of damages. Rather, it is one of several measures of damages, subject to election by the plaintiff, challenge by the defendant, and acceptance by the trier of fact. Trade secret cases in particular require "a flexible and imaginative approach to the problem of damages" (University Computing Co. v Lykes-Youngstown Corp., 504 F2d 518, 538-539 [5th Cir 1974]). Such flexibility and imagination have been, and should remain, a hallmark of our jurisprudence.
By focusing on and misconstruing the underlying proceeding and by relying on inapposite case law, the majority also fails to discern the greater point of the Second Circuit's questions. The{**31 NY3d at 460} majority ignores crucial precedent: under New York law, a defendant's ill-gotten gains are available as an equitable remedy, particularly in trade secret and unfair competition cases. Instead, the majority treats the certified questions as if they asked whether avoided-cost damages are available at law, regardless of their availability in equity. Long ago, the federal courts merged law and equity, and thus the answer to the certified question must consider the availability of avoided costs as equitable damages. The majority also disregards the widespread use of avoided-cost damages under the Restatement (Third) of Unfair Competition and the laws of other states. Such willful blindness leads the majority to provide a half-answer to the Second Circuit, "avoided-cost damages have not been historically recoverable at law," instead of a full answer: equity allows flexibility in damage awards, unrestricted to the plaintiff's lost profits.
I.
Answering the first certified question requires an examination of trade secret law. A trade secret, by definition, must have economic value and provide a competitive advantage to its owner due to the exclusive use of a product or technique (see Ashland Mgt. v Janien, 82 NY2d 395, 407 [1993]; Restatement [First] of Torts § 757, Comment b [defining a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it"]; Michael Risch, Why Do We Have Trade Secrets?, 11 Marq Intell Prop L Rev 1, 38 [2007] ["economic value is a signal to the court that the special rules associated with trade secrets are warranted"]). The factors in a trade secret claim include, among others, the value of the information to the business and its competitors, the amount of effort or money expended by the business in developing the information, and the difficulty with which the information could be properly acquired or duplicated by others (see Ashland at 407). As the majority recognizes, the loss in trade secret cases will not necessarily be comparable to that in other unfair competition cases because "trade secrets inherently derive their value from their confidentiality" (majority op at 
454). Damages in trade secret cases "are not, unlike in [*10]other commercial tort cases, confined to a single incident of loss of use and depreciation" (Felix Prandl, 
Damages for Misappropriation of Trade Secret,{**31 NY3d at 461} 22 Tort & Ins LJ 447, 447 [1987]; see also FMC Corp. v Taiwan Tainan Giant Indus. Co., Ltd., 730 F2d 61, 63 [2d Cir 1984] ["A trade secret once lost is, of course, lost forever"]).
When a trade secret is stolen, the injury encompasses many things, including the lost profits plaintiff might have made without the theft, the loss in potential exclusive licensing opportunities, the loss in the value of the secret once exposed and, perhaps most importantly, the lost incentive for others to expend their time and efforts on innovation. In simple terms, "there is no secret any longer"; but "the standard rules of damages are, however, not tailored to take this extra loss into account" (Prandl, 22 Tort & Ins LJ at 448). Thus, when the theft can be nipped in the bud, courts routinely grant injunctions, because money damages are deemed insufficient to capture the true loss suffered by a plaintiff (see e.g. Basicomputer Corp. v Scott, 973 F2d 507, 511 [6th Cir 1992] [affirming injunction because "an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate"]; Norbrook Labs. Ltd. v G.C. Hanford Mfg. Co., 126 Fed Appx 507, 509 [2d Cir 2005]; North Atl. Instruments, Inc. v Haber, 188 F3d 38, 49 [2d Cir 1999]; Computer Assoc. Intl., Inc. v Bryan, 784 F Supp 982, 986 [ED NY 1992]; Invesco Inst. [N.A.], Inc. v Deutsche Inv. Mgt. Ams., Inc., 74 AD3d 696, 697 [1st Dept 2010]; Ingenuit, Ltd. v Harriff, 33 AD3d 589, 590 [2d Dept 2006]).
The majority claims that "damages in trade secret actions must be measured by the losses incurred by the plaintiff" (majority op at 
454). By "losses incurred by the plaintiff," the majority means "plaintiff's lost profits," or perhaps "plaintiff's development costs." That narrow interpretation flouts the above basic principles and fails to engage meaningfully with the unique nature of trade secrets, as well as the differences between profits and development costs. In a trade secret case, the plaintiff's loss is the loss in value of the trade secret; that loss can be measured in several ways, but all correspond to the plaintiff's loss, even though they may differ in amount, just as a damage award based on royalties predicated on a hypothetical license may not yield the same—or even a similar—amount as damages based on the plaintiff's lost profits. Of course, plaintiffs will often want to prove lost profits as a measurement of damages, but that may be difficult or impossible to do, because factors exogenous to the theft (e.g., changes in demand, changes in costs, other competition, leak of the trade secret by{**31 NY3d at 462} the defendant to others) make the estimation of lost profits difficult or unreliable. Plaintiffs may be constrained, for practical or legal reasons, to a hypothesized royalty when, for example, there is a history of the licensing of that or other secrets by the plaintiff, evidencing the plaintiff's practice of monetizing secrets and providing yardsticks for estimating a royalty. But a plaintiff's costs of development or the costs a defendant avoided by stealing the secret are also appropriate measures, because those are reasonably related to the value of the trade secret (see University Computing Co. at 535-538; W.L. Gore & Assoc., Inc. v GI Dynamics, Inc., 872 F Supp 2d 883, 892 [D Ariz 2012]; In re Cross Media Mktg. Corp., 2006 WL 2337177, *5-6, 2006 US Dist LEXIS 56112, *12-18 [SD NY, Aug. 11, 2006, No. 06 Civ. 4228(MBM)]). It is of no moment that they may not be the same dollar number as a lost-profits analysis might show: as anyone who has ever retained an expert to determine lost profits knows, no two experts are likely to arrive at the same figure. Again, the law does not require such exactitude in recompensing a wrong.
The majority recognizes that "[w]here disclosure of a trade secret has 'destroy[ed] that competitive edge,' the plaintiff's costs of developing the product may be the best evidence of the (now-depleted) value that the plaintiff placed on the secret" (majority op at 
454 [citations omitted and emphasis added]). The majority suggests, though, that it is "neither automatically nor presumptively the case that the [defendant's cost-savings] will be an adequate approximation of the plaintiff's investment losses" (id. [emphasis omitted]).[FN2] That conclusion misses the point; the issue is not whether [*11]defendant's avoided costs {**31 NY3d at 463}adequately approximate plaintiff's investment losses, but whether they adequately measure the plaintiff's losses caused by the misappropriation. Certainly, a plaintiff may claim that the value of the secret it lost should be measured by the cost it took to develop the product or technique. A trade secret might be worth more or less than the plaintiff claims, and, in that case, the defendant may adduce evidence to challenge the plaintiff's damage claim by, for example, showing that the defendant could have developed the secret (or its equivalent) more cheaply because technology has advanced, inputs have cheapened, a license was available from a third party, etc. But a plaintiff may also present the loss in terms of the costs avoided by the defendant, which might better represent the value of the secret; that is, a secret's value can be measured by what it would cost someone else to develop it—or a good substitute for it—because no one would pay more for a secret than that amount (accounting, as well, for economic cost in terms of the difference in timing between immediate theft and protracted independent development). As the majority admits, a trade secret's value to the plaintiff is in its confidentiality and exclusive use (majority op at 
454); but the use is exclusive only so long as competitors are unwilling to fund the costs to develop the product independently. That is precisely what the defendant has avoided by stealing it, and what the plaintiff has lost due to [*12]the theft. The defendant, of course, can provide its own estimate to challenge the calculation of avoided costs,[FN3] {**31 NY3d at 464}or demonstrate that avoided costs are inappropriate given the peculiar facts of a case.[FN4]
In other words, if the defendant could have independently developed the trade secrets at a cost of $X in a period of Y years, and the plaintiff recovers $X plus the profits lost during the Y years due to the defendant's early entry made possible by the theft, the plaintiff will be put exactly into the position it would have been in had the defendant not stolen the secrets—which satisfies the majority's "fundamental purpose" to "make the victim whole" (majority op at 
448, quoting Sharapata v Town of Islip, 56 NY2d 332, 335 [1982]). The majority restricts plaintiffs to profits lost during Y years, which plainly does not restore the plaintiff to the position it would have been in had the theft not occurred, because the defendant spends nothing to obtain use of the secrets. The majority's rule fails to adhere to the proposition it touts, that damages "must be measured by the loss of the plaintiff's commercial advantage" (majority op at 
449). Here, TydenBrooks seeks only $X, which most likely undercompensates it unless its lost profits during Y were $0, in which case $X perfectly compensates TydenBrooks (subject to adjustment for the time value of money).
The majority insists that damages for trade secret misappropriation cannot include defendant's avoided costs, relying on Appellate Division cases where the measure of damages was lost profits. However, those cases do not stand for the proposition that plaintiff's losses must be measured exclusively by plaintiff's lost profits. In Hertz Corp. v Avis, Inc. (106 AD2d 246, 250 [1st Dept 1985]), the issue decided was whether Avis would be required to disclose hundreds of thousands of pages of sensitive documents; Hertz expressly stated that it had lost no profits, and the court, in passing, referred to the "basic" rule of unfair competition damages—not an exclusive rule. In fact, the portion of Hertz cited by the majority demonstrates that lost profits are considered one of many ways to measure loss (majority op at 
453, quoting Hertz at 251 [plaintiff was "entitled to recover as damages the amount of loss sustained by it, including opportunities for profit on the accounts diverted from it" (emphasis added)]). The cited Appellate Division cases that followed Hertz all involved claims of active solicitation of{**31 NY3d at 465} plaintiffs' customers, not claims that misappropriation of a trade secret devalued the secret or gave the defendant a competitive advantage by avoiding costs (see Equity Now, Inc. v Wall St. Mtge. Bankers, Ltd., 98 AD3d 909 [1st Dept 2012] [plaintiff claimed defendant stole and used confidential customer list]; Suburban Graphics Supply Corp. v Nagle, 5 AD3d 663, 665 [2d Dept 2004] [plaintiff's claim involved defendant's "actively soliciting the plaintiff's customers"]; Allan Dampf, P. C. v Bloom, 127 AD2d 719 [2d Dept 1987] [plaintiff alleged that defendant used confidential information and records to divert plaintiff's patients]). In that type of case, plaintiff's lost profits as a damages award makes sense, because the nature of the claim is that plaintiff's own customers were misdirected. However, those cases say nothing about recovery of development costs, whether direct or avoided, and certainly do not state that plaintiff's lost profits are the only measure of damages in unfair competition cases.
Nor is an examination of cases involving lost profits particularly helpful in determining the rule for avoided costs, because lost profits differ from avoided costs in important ways. Lost profits cases generally involve products or services sold to third parties, where the profits from those sales would have been realized by the plaintiff, had it not been for the defendant's misconduct. The analysis must involve a consideration of whether plaintiff would have made those sales, because the nature of the claim means that either the plaintiff or defendant would have made those sales, but not both (see infra 
at 467-468).
 Anything else would award plaintiff a windfall. Avoided costs, however, are an entirely different measure of damages. Plaintiff's own investment costs, which the majority concedes would be an appropriate measure of loss, do not depend at all on third-party sales, nor do they have any relation to a particular defendant. Rather, plaintiff's investment costs serve as "evidence of the (now-depleted) value" of the trade secret (majority op at 
454). So, too, would defendant's avoided costs. Unlike lost profits, there is no concern that plaintiff will receive more than it would have had it not been for the theft, and plaintiff's investment costs and defendant's avoided costs need not be the same. Those considerations are simply irrelevant because investment costs (direct or avoided) measure the inherent value of the trade secret, rather than actual profits gained or lost.{**31 NY3d at 466}
II.
The majority's answer to the Second Circuit's second question—whether avoided costs are available as a measure of damages for unfair competition—is similarly flawed. The majority claims that damages in unfair competition cases "must correspond to 'the amount which the plaintiff would have made except for the defendant's wrong . . . , not the profits or revenues actually . . . earned,' " relying on cases in which no claim for avoided-cost damages was made (majority op at 
449).[FN5] At the same time, the majority admits that "proof of damages for unfair competition [may be] 'especially complicated' where the injury only affects intangible 
values" and approvingly quotes Electrolux Corp. v Val-Worth, Inc. (6 NY2d 556, 571 [1959]) for the proposition that "especially true in a suit for unfair competition[, is that] disposition of each case peculiarly depends upon the precise state of facts disclosed" (majority op at 
450). The majority also expressly cites Underhill v Schenck (238 NY 7, 17 [1924, Cardozo, J.]) for the long-standing rule that "courts may award a defendant's unjust gains as a proxy for compensatory damages in an unfair competition case" (majority op at 
450 [emphasis added]), and then cites several Appellate Division cases for the proposition that such an award "is not in lieu of, damages but is 
a . . . method of computing damages" (id.). That is precisely the point: a defendant's unjust gains (here, the avoided costs) may be the method of computing plaintiff's compensatory damages. In Underhill, we recognized that "[d]amages whether resulting from infringement in the strict sense or from unfair competition can seldom be traced with even approximate precision" and courts "have {**31 NY3d at 467}thus been led to award alternative relief" (Underhill at 17).[FN6] Yet the majority's ultimate conclusion voids its recitation of those propositions; although acknowledging that "plaintiff's losses may be measured practically and [*13]flexibly" (majority op at 
450), the majority insists that "damages" (meaning recovery in a cause of action at law) must be measured by plaintiff's lost profits.
The majority reaches its conclusion by misinterpreting the holdings of Michel Cosmetics, Inc. v Tsirkas (282 NY 195 [1940]) and Hyde Park Prods. Corp. v Lerner Corp. (65 NY2d 316 [1985]). Those cases stand for a very different proposition: that the plaintiffs in those cases had not demonstrated an entitlement to recover as damages the entirety of the defendants' profits from products produced by purloined trade secrets. In Michel Cosmetics, the plaintiff sought an injunction and an accounting "for all sales and contracts made by [defendant], for the sale of lipsticks made by the secret formulae or secret processes owned by the plaintiff" (282 NY at 198). We held that the damages were inappropriate because, although the plaintiff was entitled to recover its losses, "there [was] no evidence in this case which would support a finding that plaintiff would have sold those lipsticks except for the defendants' wrong" (id. at 201). We clarified that "the evidence may be sufficient to permit the inference that the defendants have caused some loss of profits to the plaintiff, but is certainly insufficient to justify an inference that the plaintiff would have made all the sales actually made by the defendants if the defendants had not competed with it" (id. at 204 [emphasis added]). In Hyde Park, we held that the plaintiff could not receive all of the defendants' profits from sales made to improperly solicited customers. Rather, the defendant could show that specific sales did not result from solicitation, that plaintiff could not have fulfilled those customers' orders, or that the customers were no longer plaintiff's customers at the time of the sale (65 NY2d at 320).
Michel Cosmetics and Hyde Park have nothing to do with a defendant's avoided costs, or even a plaintiff's cost of development in trade secret cases. Those cases disallowed wholesale recovery of the defendant's profits as a measure of plaintiff's{**31 NY3d at 468} loss, and for good reason: the profit from a product depends not just on the trade secrets stolen, but also on many other components that may be necessary to create the product, the cost at which the defendant is able to purchase the necessary inputs, the defendant's skill in marketing, the defendant's sales efforts, the defendant's advertising expenditures, the defendant's reputation and goodwill, and a host of other factors as to which the plaintiffs in those cases had adduced no evidence.[FN7]
If Michel Cosmetics and Hyde Park tell us anything about avoided costs as trade-secret damages, it is that defendants should be allowed to challenge the amount of damages claimed; for example, by showing that the defendant could have developed the same or an equivalent method through cheaper, legitimate means (thus challenging the claimed value of the secret) or that plaintiff retained some value in the secret that should be deducted from the claimed damage amount (e.g., when a court issues an injunction after defendant has made substantial sales). Those cases provide no basis whatsoever to announce that, as a matter of New York law, a plaintiff may never "recover damages that are measured by the costs the defendant avoided due to its unlawful activity." Rather, the answer to the second question asked by the Second Circuit must be yes—as one acceptable measure of damages for unfair competition, a plaintiff may sometimes recover defendant's avoided costs as damages for its lost trade secret, because such avoided costs can be a reasonable approximation of the injury to the plaintiff, subject, of course, to evidentiary challenge by the defendant and acceptance by the trier of fact.
[*14]
The majority's answer is wrong for a second reason: common-law unfair competition "is an action in equity and not one at law" (Warren, Inc. v Turner's Gowns, Ltd., 285 NY 62, 67 [1941], citing Westcott Chuck Co. v Oneida Natl. Chuck Co., 199 NY 247, 251 [1910]). In Warren, we explained: "It is possible that in an action at law for damages proof of actual damage suffered by a plaintiff would be necessary to justify more than a{**31 NY3d at 469} nominal recovery" (id. at 68). We held that in contrast, in an action for unfair competition, "equity will treat the wrongdoer as a trustee for the plaintiff so far as the former has realized profits from its acts. . . . Inability to prove damages would not preclude plaintiffs from recovering, on an accounting, profits realized from sales unlawfully made, together with interest thereon from the time of the commencement of the action" (id.). Even in Michel Cosmetics we noted that
"[a] wrongdoer who has imitated the containers of the plaintiff and has used the secret formulas and processes belonging to the plaintiff might be compelled to 'yield up his gains to the true owner, upon a principle analogous to that which charges a trustee with the profits acquired by wrongful use of the property of the cestui que trust' " (282 NY at 199 [emphasis added], quoting Hamilton-Brown Shoe Co. v Wolf Brothers & Co., 240 US 251, 259 [1916]).
Thus, inasmuch as the majority relies on Michel Cosmetics and Hyde Park for the proposition that, because the entirety of a defendant's profits cannot be recovered in an action at law for unfair competition based on a theft of trade secrets, and therefore (although this remains quite a leap) avoided costs also cannot be recovered, the same is not true in equity. We should, therefore, answer the Second Circuit's second question affirmatively: as a matter of law, avoided-cost damages are available in a common-law claim of unfair competition.
III.
The majority fares no better in attempting to answer the Second Circuit's third question: whether avoided-cost damages are an available remedy for unjust enrichment. Instead, the majority answers an entirely different question—whether TydenBrooks can state a claim for unjust enrichment at all. We lack the power to decide that question, which the federal district court has already decided.
The cases cited by the majority, supposedly related to whether a plaintiff bringing an unjust enrichment action may recover costs that the defendant avoided, stand for no such proposition (majority op at 
455-456). Corsello v Verizon N.Y., Inc. (18 NY3d 777, 791 [2012]) and Clark-Fitzpatrick, Inc. v Long Is. R.R. Co. (70 NY2d 382, 388 [1987]) hold that a claim for unjust enrichment cannot be brought at all if it is duplicative of a{**31 NY3d at 470} contractual claim. State of New York v Barclays Bank of N.Y. involved an unjust enrichment action "framed as one for money had and received" (76 NY2d 533, 536 n 2 [1990]; see also Glen Banks, New York Contract Law § 4:27 [2d ed 28 West's NY Prac Series]). There, we held that the claim was not viable where the checks at issue were never actually or constructively delivered to the plaintiff (76 NY2d at 540). Those cases say nothing about avoided costs as damages, or anything about damages whatsoever, for that matter.[FN8]
Relying on IDT Corp. v Morgan Stanley Dean Witter & Co. (12 NY3d 132 [2009]), the majority asserts that where a defendant avoids costs that would have been paid to third parties, the defendant is not enriched "at the expense of" the plaintiff (majority op at 
457). That assertion suggests that TydenBrooks cannot bring its claim for unjust enrichment at all, because one of the elements of the claim is not satisfied—not that avoided costs are unavailable as damages to a plaintiff who has proved its claim. Indeed, in IDT, we held that the claim for unjust enrichment should be dismissed (id. at 142); we cannot hold that here. Furthermore, Morgan Stanley was not enriched "at IDT's expense" because IDT did not pay the investment banking fee Morgan Stanley allegedly received, nor was IDT deprived of any investment banking fee by Morgan Stanley's alleged misuse of IDT's confidential information, because IDT was not in the investment banking business (it was a telecommunications company) and was never going to be retained as an investment banker and receive investment banking fees. Certainly, an element of the claim of unjust enrichment is that the defendant must have been enriched at the plaintiff's expense; but it can hardly be said that pilfered commercially valuable trade secrets are not stolen "at the plaintiff's expense." Here, it [*15]would be impossible to say so, in view of the jury's express finding in TydenBrooks' favor as to each of those elements, contained in black and white on the verdict sheet, which we may not disturb.
Even were it within our power to decide whether a cause of action for unjust enrichment lies here, and were one to read the majority opinion to say that it does not, that would be{**31 NY3d at 471} grave error, inconsistent with our precedents. Like the common-law action for unfair competition (see supra at 
468), an action for unjust enrichment is an action in equity, not at law (see Georgia Malone & Co., Inc. v Rieder, 19 NY3d 511, 516 [2012]; Paramount Film Distrib. Corp. v State of New York, 30 NY2d 415, 421 [1972]). That TydenBrooks may have a remedy at law, restricted to its lost profits as the majority here announces, would not disable it from recovering in equity through unjust enrichment. Thus, in Falk v Hoffman (233 NY 199, 201-202 [1922, Cardozo, J.]), we held that although a shareholder suing at law could either rescind and recover the value of his shares, or affirm and recover the value of his shares less what he had been (fraudulently) paid for them, he could sue in equity to recover more:
"[E]quity will intervene to declare the wrongdoers trustees. Some remedy at law there is. It is not so complete or effective as the remedy in equity. Suing at law, the plaintiff would be restricted to the value of his shares, if he rescinded, or to the difference between the value and par . . . , if he affirmed. Suing in equity, he may reach the proceeds of the resale, securities and cash, though the price upon resale is found to be greater than the value. . . . Equity will not be overnice in balancing the efficacy of one remedy against the efficacy of another when action will baffle, and inaction may confirm, the purpose of the wrongdoer" (citations omitted).
We have consistently upheld the principle that a common-law cause of action for unjust enrichment prevents a defendant from retaining any benefit wrongly received. Unjust enrichment is "undoubtedly equitable and depends upon broad considerations of equity and justice" (Paramount Film Distrib. Corp. at 421; see also Saunders v Kline, 55 AD2d 887, 888 [1st Dept 1977] ["it is not a necessary element of a cause of action for unjust enrichment to show that plaintiff suffered a loss corresponding to the gain received by the defendant"]).[FN9] Cambridge Security Seals was unjustly enriched by stealing to avoid{**31 NY3d at 472} development costs, which injured TydenBrooks. It would be against equity to allow the defendant to retain the value it received (see Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 182 [2011]).
The answer to the question certified by the Second Circuit is obvious merely from stating the question: recovery of the benefit obtained by the defendant is the definition of an action for unjust enrichment: "The essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered" (Mandarin Trading at 182 [emphasis added], quoting Paramount Film Distrib. Corp. [*16]at 421). Especially when defendant's enrichment has come about by wrongdoing, plaintiff's recovery may even include defendant's gains (see Restatement [Third] of Restitution and Unjust Enrichment § 51).
IV.
The most curious feature of the majority's opinion is that, by completely neglecting the availability of avoided costs as a measure of equitable damages, it answers the question in a way that renders the proffered answer irrelevant to the Second Circuit. We have recognized—and the majority does not dispute—that disgorgement of defendant's ill-gotten gains is available as an equitable remedy, including in cases involving intellectual property (see Warren, Inc. v Turner's Gowns, Ltd., 285 NY 62, 68 [1941] [in unfair competition case based on trade name infringement, "equity will treat the wrongdoer as a trustee for the plaintiff so far as the former has realized profits from its acts. . . . Inability to prove damages would not preclude plaintiffs from recovering, on an accounting, profits realized from sales unlawfully made, together with interest thereon from the time of the commencement of the action"]; Michel Cosmetics, Inc. v Tsirkas, 282 NY 195, 199 [1940]; New York Bank Note Co. v Hamilton Bank Note Engraving & Print. Co., 180 NY 280, 295-297 [1905]; Falk v Hoffman, 233 NY 199, 201 [1922]).{**31 NY3d at 473}
To avoid our ancient, settled law that equity permits disgorgement of a defendant's ill-gotten gains, the majority tacitly interprets the word "damages" to mean damages historically recoverable at law, not in equity. The majority offers no reason for doing so, and does not even attempt to account for our decisions in Warren, New York Bank Note, or Hoffman. Interpreting the Second Circuit's questions as restricted to damages at law is in fundamental conflict with the manner in which federal courts have operated for the past 80 years, since their merger of law and equity in 1938. Federal Rules of Civil Procedure rule 54 (c) provides that, other than for default judgments, "[e]very . . . final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." The Advisory Committee note explains that this portion of rule 54 (c) "makes clear that a judgment should give the relief to which a party is entitled, regardless of whether it is legal or equitable or both."[FN10]
Federal courts, governed by rule 54 (c), award damages without regard to whether they arise from a legal or an equitable cause of action (see e.g.In re Fasano/Harriss Pie Co., 848{**31 NY3d at 474}  F2d 190 [6th Cir 1988] [table; text at 1988 WL 44738, *2 (1988)] ["FMA next argues that it should not have been held liable under the equitable doctrine of unjust enrichment because the theory was not pleaded by plaintiffs. Rather, plaintiffs brought an action at law alleging that FMA had breached an express contract. Rule 54(c), however, supports the granting of equitable relief in such circumstances"]; Kaszuk v Bakery & Confectionery Union & Indus. Intl. Pension Fund, 791 F2d 548, 559 [7th Cir 1986] ["Rule 54(c) 'has been liberally construed, leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the facts proved.' This includes injunctive relief when appropriate, and even when not specifically requested" (citations omitted)], quoting United States v Marin, 651 F2d 24, 31 [1st Cir 1981]; Travis v Gary Community Mental Health Ctr., Inc., 921 F2d 108, 112 [7th Cir 1990] ["Fed.R.Civ.P. 54(c) requires courts to award the relief to which the prevailing party is entitled, even if that party did not request the relief or relied on the wrong statute"]).
Thus, the Second Circuit did not ask us whether avoided costs may be an appropriate measure at law but not in equity. Upon the jury's finding of liability, the federal courts are indifferent to under which of those branches the relief is available. The majority's opinion does not dispute the availability of a defendant's avoided costs as damages in equity. Indeed, the majority goes so far as to say that a defendant's gain may be used as "the method of computing damages" (majority op at 
450 [emphasis omitted]). Thus, the majority's ostensible "no" is a practical "yes," unless we turn the clock back to 1937.
V.
Suppose, for a moment, that the majority is entirely right: although the answer is not dictated by our precedents, they suggest that plaintiffs cannot recover defendant's avoided costs as a measure of compensatory damages. The approach provided by nearly all other jurisdictions and the Restatement (Third) of Unfair Competition explicitly allows plaintiffs in trade secret cases to recover the plaintiff's cost of development or the defendant's avoided costs. That is of no moment to the majority. The suggestion that our Court—the Court that, in Judge Cardozo's time and thereafter, led the nation in advancing the laws that govern civil wrongs in contract, tort and equity—should turn a blind eye and disregard our duty "to bring the law into accordance with present day standards of wisdom and{**31 NY3d at 475} justice" (Woods v Lancet, 303 NY 349, 355 [1951], quoting Funk v United States, 290 US 371, 382 [1933]) is most perplexing.
[*17]
Underlying the majority's hidebound view that a plaintiff's lost profits must always be the remedy for theft of commercially valuable information of any type is a failure to comprehend the difference between private goods and public goods,[FN11] and therefore the reasons that some types of public goods, if they are to exist, require a damage remedy that, though not punitive, is not cabined to the plaintiff's lost profits. That is, the appropriate calculus for thefts of private goods should not constrain the calculus for thefts of public goods (see e.g. Roger D. Blair & Thomas F. Cotter, An Economic Analysis of Damages Rules in Intellectual Property Law, 39 Wm & Mary L Rev 1585, 1590 [1998] ["the optimal set of damages rules should preserve both the incentive structure of intellectual property law and the property-like character of intellectual property rights . . . in the absence of enforcement, information, and other transaction costs, these goals require at a minimum an award that renders the infringer no better off as a result of the infringement"]; Mark A. Lemley, The Surprising Virtues of Treating Trade Secrets as IP Rights, 61 Stan L Rev 311, 329-330 [2008] ["Trade secrets are best understood not as applications or extensions of existing common law principles (warranted or unwarranted), but as IP rights. . . . A right to exclude does not have to be absolute to be effective in rewarding and therefore encouraging innovation. It need merely provide sufficient advantage in terms of lead time or relative costs to minimize or eliminate the public goods problem"]).
The majority also abandons our role in crafting the common law to fulfill the policy goals of this State. The Supreme Court of the United States has identified the general policies behind trade secret law as the "maintenance of standards of commercial ethics and the encouragement of invention" (Kewanee, 416 US at 481). The legal protections against theft of advancements in the sciences, arts and industry—not to punish, but to spur innovation—is embodied in the United States Constitution {**31 NY3d at 476}(US Const, art I, § 8, cl 8). "Trade secret law will encourage invention in areas where patent law does not reach, and will prompt the independent innovator to proceed with the discovery and exploitation of his invention" (Kewanee, 416 US at 485; see also Rockwell Graphic Sys., Inc. v DEV Indus., Inc., 925 F2d 174, 180 [7th Cir 1991] ["trade secret protection is an important part of intellectual property, a form of property that is of growing importance to the competitiveness of American industry. . . . The future of the nation depends in no small part on the efficiency of industry, and the efficiency of industry depends in no small part on the protection of intellectual property"]).
New York, as the nation's commercial center and a hub of innovation, embodies those goals by fostering inventors and innovation; those are unmistakable goals of our legislative and executive branches (see e.g. Press Release, Governor Cuomo Announces Highlights of the FY 2019 Budget [Mar. 30, 2018] [announcing budget includes "$600 million to support construction of a world-class, state-of-the-art life sciences public health laboratory in the Capital District that will promote collaborative public/private research and development partnerships"]; Governor Andrew Cuomo, State of the State Address to 2015 New York Legislature [announcing "new innovation hotspots . . . (to) provide one-stop funding and services—legal services, accounting services, all the services (inventors) need to grow their business"]).
What commercial ethics or invention is encouraged by the majority's decision? What does that decision bode for our role in molding the common law to changing times? By rejecting the predominant rule accepted by most states and the Restatement, the majority undermines the policy goals of this State and casts off our mantle. Under the majority's rule, I am encouraged to steal your trade secrets. If I can make better use of them than you, because I am a better salesperson, better funded or a cheaper purchaser of inputs, even if I lose when you sue me, I can make a net profit, repaying you only what you can prove you lost in sales. If I am not better suited to exploit your trade secrets, I [*18]may nevertheless profit if you are unable to prove your lost sales, which, because of the messiness of the real world, is often difficult or impossible to do. At worst, I may be subjected to an injunction, but at that point, the secret has begun to leak out, and you will be hard-pressed to prove that some third, fourth or fifth party derived its identical{**31 NY3d at 477} process from your secret. The incentive for others to innovate will be replaced by the incentive to steal. Punitive damages, of course, remain as a deterrent, but because many trade secrets are allegedly stolen by employees moving from one company to another (which, quite correctly, the law does not restrain per se), the theft is difficult enough to prove, and punitive damages in those situations are uncommon, as this case itself demonstrates. Likewise, although you may have purposefully refrained from licensing your secret to anyone, you may be forced to accept a "reasonable royalty" from the defendant as damages, based on a conjectural price at which you might have licensed your secret—a sort of eminent domain power for thieves.
Cases such as this, "where a decision one way or the other, will count for the future, will advance or retard, sometimes much, sometimes little, the development of the law . . . are the cases where the creative element in the judicial process finds its opportunity and power" (Benjamin Cardozo, The Nature of the Judicial Process 165 [Yale University Press 1921]). Judge Cardozo set that course for us a century ago; I am saddened we shirk from it; doubly so when the Second Circuit has steered us to it.
Chief Judge DiFiore and Judges Stein and Garcia concur; Judge Wilson dissents in an opinion in which Judges Rivera and Fahey concur.
Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, first certified question answered in the negative and second certified question not answered as unnecessary.

Footnotes

Footnote 1:We also accepted the following certified question from the Second Circuit: "If the answer to the first question is 'yes,' whether prejudgment interest under New York Civil Practice Law and Rules § 5001(a) is mandatory where a plaintiff recovers damages as measured by the defendant's avoided costs" (id. at 752). We do not reach the second question because we answer the first question in the negative.

Footnote 2:TydenBrooks also asserted claims under the federal "Lanham Act," 15 USC § 1125 (a), and the District Court exercised supplemental jurisdiction over the New York common-law claims pursuant to 28 USC § 1367. TydenBrooks' Lanham Act claims are not at issue here.

Footnote 3:TydenBrooks' damages expert further testified that this figure would be $7.8 to $16.6 million if "fully burdened costs," i.e., retirement and health benefits, are taken into account.

Footnote 4:Section 5001 (a) provides that "[i]nterest shall be recovered upon a sum awarded . . . because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion."

Footnote 5:Indeed, the law could not categorically prevent businesses from "reaping where they have not sown" in the absence of inherently perfidious conduct and actual injury to a competitor. Virtually every form of technological and creative progress stands on ideas and information taken from others (see Harper & Row, Publishers, Inc. v Nation Enterprises, 471 US 539, 582 [1985, Brennan, J., dissenting]).

Footnote 6:The Court noted that
"[a] wrongdoer who has imitated the containers of the plaintiff and has used the secret formulas and processes belonging to the plaintiff might be compelled to 'yield up his gains to the true owner, upon a principle analogous to that which charges a trustee with the profits acquired by wrongful use of the property of the cestui que trust' " (id. at 199, quoting Hamilton-Brown Shoe Co. v Wolf Brothers & Co., 240 US 251, 259 [1916]).
However, as the defendant did not actually make any profits, no such constructive trust was imposed (id. at 198).
Footnote 7:The term "unjust enrichment" (or "restitution") can refer to a number of distinct concepts, and courts employing these terms have meant different things in different contexts (see generally Doug Rendleman, Measurement of Restitution: Coordinating Restitution with Compensatory Damages and Punitive Damages, 68 Wash & Lee L Rev 973, 976 [2011] [describing multiple concepts that have historically been referred to as "restitution" and noting that "(o)ur court-made common law jurisprudence has not developed fences around the doctrines to define exact boundaries"]). As a remedy, unjust enrichment, in contrast to damages, is designed to avoid wrongful gains rather than compensate the plaintiff for its losses (see Dobbs Law of Remedies: Damages, Equity, Restitution § 4.1 [1] [2d ed 1993]). As a cause of action, however, unjust enrichment simply refers to liability imposed on a defendant who has been enriched apart from a breach of an independent legal duty (see Corsello, 18 NY3d at 790-791).

Footnote 1:The first certified question is really three separate questions, one each for trade secret theft, unfair competition and unjust enrichment. The Second Circuit certified an additional question concerning prejudgment interest, to be answered if any of the other questions was answered in the affirmative. Because the majority has not answered that question, I also do not.

Footnote 2:The majority's objection that we cannot measure "plaintiff's actual expenditures, a known quantity, by the defendant's projected expenditures, an unknown one," is a challenge suitably made by defense counsel in attacking a plaintiff's damage model, but not a basis to deny recovery as a matter of law (majority op at 
455 [emphasis omitted]). Avoided-cost damages do not attempt to measure plaintiff's actual expenditures; they measure plaintiff's loss—the loss of the exclusive use of the trade secret—by providing an approximation of its value: what would it cost the defendant to have developed the secret on its own? Here, TydenBrooks' damage model consisted of two components: capital costs for construction of the machines incorporating the trade secrets, and labor costs associated with the development of the trade secrets and incorporation into the first-generation machines. The $1,886,395 of capital costs included in the damage estimate was—without any adjustment—the capital cost TydenBrooks itself incurred. So, when the majority says, "TydenBrooks did not present any evidence, or otherwise argue, that CSS's avoided costs could be a proxy for its own losses (such as 
its investment losses)," that is flatly incorrect, at least as to the $1,886,395 of capital costs (majority op at 
445.
The labor cost component was based on a high and a low estimate of the number of hours TydenBrooks spent developing the trade secrets, allocated by the type of work involved to specific persons (or types of persons) actually employed by Cambridge Security Seals, and multiplied by the monthly cost of each of those employees. That is, instead of claiming that Cambridge Security Seals could have hired the relevant employees at the wages paid by TydenBrooks, TydenBrooks used Cambridge Security Seals' actual rate of pay, multiplied by an estimate of the actual hours it needed to develop the trade secrets. There is nothing "unsubstantial [or] imaginary" about that method (majority op at 
455). If the hourly rates or estimated hours are overstated, it is up to a defendant to challenge them by contrary evidence, including expert opinion.
Footnote 3:Indeed, defendant here attempted that proof; from what we can tell based on the verdict, the jury here credited Cambridge Security Seals' attack on the avoided-cost damages proffered by TydenBrooks, awarding $3.9 million in damages instead of the $7.8-16.6 million claimed by TydenBrooks' expert.

Footnote 4:For example, if an injunction issued before a defendant had made any use or disclosure of the trade secrets, avoided costs would most likely not be an appropriate measure of damage.

Footnote 5:The claim in Santa's Workshop v Sterling (3 NY2d 757 [1957], affg 2 AD2d 262 [3d Dept 1956]) was that defendant diverted plaintiff's customers by unlawfully imitating plaintiff's advertising and publicity materials. David Fox & Sons v King Poultry Co. (23 NY2d 914 [1969], modfg on dissenting op 30 AD2d 789 [1st Dept 1968]) and McRoberts Protective Agency v Lansdell Protective Agency (61 AD2d 652 [1st Dept 1978]) turned on even narrower grounds involving specific deductions and net-vs.-gross profits. Under the specific facts of those cases, in which no plaintiff sought development costs or avoided costs as damages, plaintiff's profits may often have been the best measure of damages, but not always so (see Epstein Eng'g, P.C. v Cataldo, 124 AD3d 420, 421 [1st Dept 2015] ["Plaintiff may elect to measure its damages in this unfair competition action by reference to the profits made by defendants from clients or business opportunities diverted from plaintiff" (emphasis added)]).

Footnote 6:It is noteworthy that the "unjust gains" in Underhill referred to the defendant's profits, not the tamer, more directly-related amount of avoided costs.

Footnote 7:If the only form of damages available were the entirety of a defendant's profits, the results would sometimes be unjustified; for example, a valve manufacturer stealing my trade secret relating to valve manufacture would pay all its profits to me, as would an automobile manufacturer who stole my valve trade secret and used it in the tires of cars it sold—including all the profits on the cars. A trade secret thief who broadly published but made no commercial use of my trade secrets would owe me nothing; one who, through great skill and effort, successfully commercialized them beyond anything I ever could have accomplished would owe me everything.

Footnote 8:If cited to show that trade secret plaintiffs may not ever bring a claim for unjust enrichment, Corsello and Clark-Fitzpatrick hold nothing of the kind (because trade secret thieves do not usually steal by contract), and, as mentioned above, any such holding is far beyond the scope of the certified question.

Footnote 9:The availability of unjust enrichment in trade secret actions is particularly equitable (see Risch, 11 Marq Intell Prop L Rev at 59 ["Because the economic justification of trade secrets differs from the justification for patents and copyrights, disgorging unjust enrichment is important. If the competitor values the secret in an amount more than the owner will lose or if the court undervalues the amount of the owner's loss, then the competitor will have an incentive to spend more on appropriation. In turn, this will cause the owner to spend more on protection than it otherwise might need to if it had the remedy, leading to the same 'arms race' without a commensurate gain in expected social value. Thus, the law disgorges the additional benefit in order to reduce the competitor's incentive to focus more resources on appropriation"]).

Footnote 10:Wright and Miller's Federal Practice and Procedure § 2662 provides a full explanation:
 "Perhaps most significantly subdivision (c) is designed to implement the merger of law and equity mandated by Rule 2 by allowing relief to be given that is consistent with what is shown to be necessary to compensate the parties or remedy the situation without regard to the constraints of the antiquated and rigid forms of action. At common law it was held that plaintiff could not recover anything other than the relief specifically requested in the ad damnum clause of the complaint. In equity, however, the general practice was for plaintiff to demand whatever special relief desired and then to add a prayer for general relief. If the court decided that the evidence did not justify the specific remedy requested, it could rely on the general prayer for relief for the purpose of granting the relief to which plaintiff actually was entitled. Rule 54(c) adopts the more liberal approach used by the equity courts for all civil actions, whether they formerly would be brought at law or in equity, as long as defendant has not defaulted. In this way the rule effectuates one of the objectives of the federal rules—the development of a uniform procedure for all civil actions" (see also 10 Moore's Federal Practice—Civil § 54.70).
In any event, TydenBrooks expressly sought equitable relief in its complaint: "That the Defendants be adjudged to have been unjustly enriched . . . and that Defendants be required to disgorge the profits gained as a result of their conduct and actions and any other appropriate equitable remedy including that the Defendants be enjoined from such unlawful act or practice."
Footnote 11:Private goods are, in the economics parlance, rivalrous and excludable. That is, if I consume my $5 sandwich, you cannot ("rivalrous"), and I can readily prevent you from consuming it ("excludable"). If I create a secret recipe for the sauce used on my sandwiches, your using the recipe does not stop me from using it too ("nonrivalrous"), and—absent legal protection—I cannot easily prevent you from using the recipe once you learn it ("nonexcludable").